# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

A WOMAN'S CONCERN, INC., d/b/a YOUR OPTIONS MEDICAL CENTERS,
*Plaintiff-Appellant,*

v.

MAURA HEALEY, GOVERNOR OF MASSACHUSETTS, sued in her individual and official capacities; ROBERT GOLDSTEIN, COMMISSIONER OF THE MASSACHUSETTS DEPARTMENT OF PUBLIC HEALTH, sued in his individual and official capacities; REPRODUCTIVE EQUITY NOW FOUNDATION, INC.; REBECCA HART HOLDER, EXECUTIVE DIRECTOR OF REPRODUCTIVE EQUITY NOW FOUNDATION, INC.,

*Defendants-Appellees.*

On Appeal from the United States District Court for the District of Massachusetts
(No. 1:24-cv-12131-LTS)

## OPENING BRIEF OF PLAINTIFF-APPELLANT

SAMUEL J. WHITING
  (Bar no. 1206554)
MASSACHUSETTS LIBERTY
  LEGAL CENTER
P.O. Box 2616
Acton, MA 01720
(781) 569-0400
sam@mafamily.org

OLIVIA F. SUMMERS
  (Bar no. 1214561)
JORDAN A. SEKULOW
  (Bar no. 1218870)
STUART J. ROTH
  (Bar no. 1217356)
ANDREW J. EKONOMOU
  (Bar no. 1217357)
CHRISTINA (STIERHOFF) COMPAGNONE
  (Bar no. 1222867)
NATHAN J. MOELKER
  (Bar no. 1214534)
AMERICAN CENTER FOR
  LAW & JUSTICE
201 Maryland Ave., NE
Washington, DC 20002
(757) 955-8176
osummers@aclj.org

*Counsel for Plaintiff-Appellant*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant, A Woman's Concern, Inc. d/b/a Your Options Medical Centers, certifies that it is a religious non-profit organization with no parent corporation and that no public company owns any interest in it.

/s/ *Olivia F. Summers*
Olivia F. Summers
  (Bar no. 1214561)
AMERICAN CENTER FOR LAW &
  JUSTICE
201 Maryland Ave., NE
Washington, DC 20002
(757) 955-8176
osummers@aclj.org

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................ iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ..........................................1

JURISDICTIONAL STATEMENT .......................................................................1

STATEMENT OF THE ISSUES.............................................................................1

INTRODUCTION ...................................................................................................2

STATEMENT OF THE CASE ................................................................................3

SUMMARY OF THE ARGUMENT .....................................................................12

ARGUMENT .........................................................................................................16

    I.    Standard of Review.................................................................................16

    II.    The Amended Complaint Plausibly Alleges a Violation of YOM's Right to Free Speech Under the First Amendment .................................................17

        A.   The First Amendment Prohibits Government Officials from Using Regulatory Power to Coerce or Suppress Disfavored Speech..........................19

        B.   Defendants' Coordinated Campaign Satisfies *Vullo*'s Four-Factor Coercion Framework...........................................................................................21

            1.   Word Choice and Tone...................................................................22

            2.   Regulatory Authority .....................................................................27

            3.   Perception .....................................................................................32

            4.   Adverse Consequences ..................................................................36

        C.   The Coordinated Campaign Has Chilled YOM's Speech Through Concrete Harm ................................................................................................40

    III.   The Amended Complaint Plausibly Alleges a Violation of YOM's Right to Free Exercise of Religion Under the First Amendment..........................43

IV.  The Amended Complaint Plausibly Alleges an Equal Protection Violation ..................................................................................47

V.   The District Court Did Not Decide, and Its Caveat Does Not Defeat, YOM's State-Action Allegations Against REN and Holder.........................52

CONCLUSION.................................................................................................55

CERTIFICATE OF COMPLIANCE.................................................................56

CERTIFICATE OF SERVICE .........................................................................57

ADDENDUM

# TABLE OF AUTHORITIES

**CASES**

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970). ...................................................................53

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009). ............................................................. 16, 45

*Backpage.com, LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015) ............................................... passim

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963). .............................................................. passim

*Barrington Cove Ltd. P'ship v. R.I. Hous. and Mortg. Fin. Corp.*,
246 F.3d 1 (1st Cir. 2001). ....................................... 47, 48, 51

*Bass v. Parkwood Hosp.*,
180 F.3d 234 (5th Cir. 1999). ....................................................53

*Bates v. City of Little Rock*,
361 U.S. 516 (1960). ..................................................................41

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026)...............................................................18

*Church of Lukumi Babalu Aye v. City of Hialeah*,
508 U.S. 520 (1993). ........................................................... 43, 46

*Commonwealth v. Landry*,
438 Mass. 206 (2002) .................................................................23

*Dennis v. Sparks*,
449 U.S. 24 (1980). ....................................................................53

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) .....................................................................4

*Douglas v. Hirshon*,
  63 F.4th 49 (1st Cir. 2023). .................................................................16

*Estades-Negroni v. CPC Hosp. San Juan Capestrano*,
  412 F.3d 1 (1st Cir. 2005). ..................................................................53

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
  2026 U.S. LEXIS 1949, 146 S. Ct. 1114  (Apr. 29, 2026). .............. 14, 18, 41, 42

*Frederick Douglass Found., Inc. v. District of Columbia*,
  82 F.4th 1122 (D.C. Cir. 2023). ...........................................................20

*Gibson v. Fla. Legis. Investigation Comm.*,
  372 U.S. 539 (1963). ...........................................................................29

*Hankard v. Town of Avon*,
  126 F.3d 418 (2d Cir. 1997). ...............................................................41

*Laird v. Tatum*,
  408 U.S. 1 (1972). ...............................................................................40

*Levin v. Harleston*,
  966 F.2d 85 (2d Cir. 1992). .................................................................41

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
  584 U.S. 617 (2018). ................................................................. 14, 43, 46

*McKee v. Cosby*,
  874 F.3d 54 (1st Cir. 2017). ........................................................ 16, 35

*Nat'l Inst. of Family & Life Advocs. v. James*,
  160 F.4th 360 (2d Cir. 2025). .............................................................26

*Norwood v. Harrison*,
  413 U.S. 455 (1973). ...........................................................................54

*NRA of Am. v. Vullo,*
  602 U.S. 175 (2024). ................................................................... passim

*Okwedy v. Molinari*,
  333 F.3d 339 (2d Cir. 2003) .................................................................. 20, 28, 31, 32

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
  460 U.S. 37 (1982). .................................................................................47

*Rattner v. Netburn,*
  930 F.2d 204 (2d Cir. 1991) .................................................................. 32, 37

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995). .................................................................................17

*Rubinovitz v. Rogato,*
  60 F.3d 906 (1st Cir. 1995). .................................................................48

*State Cinema of Pittsfield, Inc. v. Ryan*,
  422 F.2d 1400 (1st Cir. 1970) .................................................................19

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014). .................................................................................41

*Tapalian v. Tusino*,
  377 F.3d 1 (1st Cir. 2004). .................................................................47

*Va. v. Am. Booksellers Ass'n*,
  484 U.S. 383 (1988). .................................................................................42

*Wilson v. HSBC Mortg. Servs., Inc.*,
  744 F.3d 1 (1st Cir. 2014). .................................................................16

**STATUTES**

18 U.S.C. § 1956 .................................................................................23

**RULES**

Fed. R. Civ. P. 12(b)(6) .................................................................. 13, 15, 16, 45

**REGULATIONS**

243 Mass. Code Regs. § 2.07(11)(a)(1) .................................................................26

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiff-Appellant respectfully requests oral argument. This appeal presents important questions concerning the constitutional line between permissible government advocacy and unconstitutional coercion of disfavored speakers. Oral argument would assist the Court in resolving the significant constitutional and factual issues presented by this appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiff's federal claims arise under the First and Fourteenth Amendments to the United States Constitution, as enforceable through 42 U.S.C. § 1983.

This Court has jurisdiction because Plaintiff appeals from a final order disposing of all its claims following a grant of a motion to dismiss. 28 U.S.C. § 1291. The district court entered its order dismissing the case on February 17, 2026, Add.60, and Plaintiff timely appealed on March 16, 2026. App.15–16.

## STATEMENT OF THE ISSUES

Whether the district court erred in dismissing Plaintiff's Amended Complaint, including its Free Speech, Free Exercise, and Equal Protection claims, where the district court, at the pleading stage, failed to draw reasonable inferences in Plaintiff's

1

favor from allegations that Defendants engaged in a coordinated campaign of coercion against Plaintiff and other pro-life pregnancy centers ("PRCs").

**INTRODUCTION**

This case concerns the constitutional line between permissible government persuasion and unconstitutional coercion. Plaintiff A Woman's Concern, Inc. d/b/a Your Options Medical Centers ("YOM") does not challenge the Commonwealth's right to express its own views on abortion. YOM challenges Defendants-Appellees' coordinated campaign. Funded by the Commonwealth, directed by senior government officials, and carried out in partnership with a state-funded pro-abortion advocacy group, the campaign branded pro-life pregnancy resource centers ("PRCs") as "dangerous," "deceptive," and a "public health threat," solicited complaints against them, and issued regulatory guidance aimed at placing those centers "on notice" of potential adverse consequences.

Together, these actions stigmatized PRCs and chilled YOM's religiously motivated speech because of its pro-life viewpoint. When a licensed medical provider with a twenty-five-year record of zero patient complaints loses a physician, turns away patients, and watches its medical director endure a two-year investigation triggered by a complaint from the State's own campaign partner—all without a single independent finding of wrongdoing—something has gone wrong, and the First Amendment has a name for it: coercion.

2

The district court erred when it examined each component of the coordinated campaign in isolation and drew inferences against YOM rather than in its favor— the very approach the Supreme Court criticized in *NRA of Am. v. Vullo,* 602 U.S. 175 (2024). Properly viewed as a whole, and with all reasonable inferences drawn in YOM's favor as required at the pleading stage, the Complaint plausibly alleges violations of the Free Speech and Free Exercise Clauses of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. This Court should reverse.

## STATEMENT OF THE CASE

### A.    YOM's Religious Mission and Operations

YOM is a Christian nonprofit organization operating licensed medical pregnancy centers in Massachusetts. App.20. Founded by three Christian families in 1991, YOM provides free ultrasounds, pregnancy options counseling, and material support (such as diapers and baby clothes) to women and couples facing unexpected pregnancies. App.21–22. YOM's ministry is rooted in its sincerely held Christian belief that all human life is sacred and made in the image of God. App.22. As a life-affirming entity, YOM does not perform abortions, refer for abortions, or advertise that it does so. App.22. Its services include providing information about abortion pill reversal using progesterone. App.22.

YOM has been licensed by the Massachusetts Department of Public Health ("DPH") as a medical facility since 1999 and has renewed its license every two years as required by law. App.22. Over the twenty-five years of its operation, YOM has received zero patient complaints. App.23.

**B.      The Coordinated State Campaign Against PRCs, Including YOM**

Shortly after the U.S. Supreme Court's decision in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), Massachusetts officials began a coordinated campaign targeting pro-life PRCs for public condemnation. In July 2022, then-Attorney General Maura Healey issued a consumer advisory warning the public about "crisis pregnancy centers," quoting Defendant Rebecca Hart Holder's statement that such centers are "dangerous facilities" that use "deceptive advertising"—claims made without supporting evidence. App.24–25. The advisory warned the public about PRCs in general, and while it acknowledged that some PRCs are medically licensed, it did not distinguish between licensed and unlicensed pregnancy centers when warning the public against them. App.24–25. Consequently, YOM was swept into the State's broad condemnation of PRCs as "deceptive," "fake," and "dangerous," *see* App.85–86, and continued to be so throughout Defendants' pressure campaign. As discussed in detail *infra*, this contradicts the district court's conclusion that "[t]he statement discussed PRCs generally in this

manner; nothing in the press release directly *or indirectly* referred to YOM." Add.5 (emphasis added).

In March 2023, the Massachusetts legislature appropriated no less than $1 million for a public awareness campaign expressly targeting PRCs, and an additional $250,000 to fund Reproductive Equity Now's ("REN") "free abortion legal hotline" targeted at soliciting complaints against PRCs. App.34–35, 38. Defendant REN is a pro-abortion activist nonprofit organization dedicated to "[a]dvancing reproductive [equity and] justice and eliminating barriers to . . . abortion care." App.21. REN had a formal agreement as a full-time contractor for the Commonwealth and worked hand-in-hand with DPH and the State's advertising agency, MORE Advertising, to create the public awareness campaign that was ultimately launched targeting PRCs. App.21–22. REN participated in both the planning and implementation of the campaign—including strategy meetings and the creation of messaging and materials—with its input carrying the same weight as that of DPH employees. App.40, 44, 53, 57.

Internal documents confirm that the campaign's explicit goal was to warn the public *against* PRCs. A MORE Advertising PowerPoint presented to state officials specifically identified YOM by name and included a slide asking, "How do we want to tackle/address religious aspects of these places." App.41. In another instance, a MORE employee emphasized that continuing to publish PRC logos on REN's

website was "awesome to keep" because it was "not something we can do on mass.gov." App.55.

On January 3, 2024, DPH issued a press release criticizing PRCs as holding themselves out as "full-service reproductive health clinics," while not providing "abortion care or abortion referrals," and for being affiliated with religious organizations advancing "an anti-abortion agenda." App.28. Notably, DPH provided no actual examples of PRCs advertising themselves as offering abortions or abortion referrals. Nor did the press release provide any testimonials or complaints from patients who alleged that they were deceived into visiting a PRC because they believed PRCs provided abortions or abortion referrals. *See* App.85–86.

That same day, Defendant Commissioner Goldstein issued an administrative guidance nominally to all licensed providers, although the publicly visible file name read **"Guidance on Anti-abortion center and standard of care reminder guidance – 1.3.2024[.]"** App.29 [hereinafter "Guidance"]. Internal DPH communications confirm that, as the document name indicated, the Guidance was intended to "**put anti-abortion centers on notice[]**" of state scrutiny. App.29, 46–47. The Guidance warned that physicians or APRNs who provided information on medical abortion reversal "could be found to be practicing inconsistently with accepted practice and subject to discipline[,]" App.48, even though that practice is legal in Massachusetts.

While the district court noted that the Guidance was for *every* licensed physician, nurse, pharmacist, and more in Massachusetts, Add.2, the Guidance clearly singles out and targets PRCs. This is made clear by the Guidance's criticism of the prescription of progesterone to counteract the abortion pill, its file name, its threats to physicians engaged in, or affiliated with clinics that engaged in, so-called "deceptive practices," and its being featured on a webpage containing a press release on "anti-abortion centers[.]" App.29, 30, 31.

Prior to the DPH press release and issuance of the Guidance, and as part of assisting DPH in crafting the public awareness campaign against PRCs, Defendant Holder, on behalf of REN, filed a complaint against YOM in October 2023 alleging deceptive advertising regarding its mobile unit. App.26. DPH used this complaint (and another complaint from REN) to justify enforcement actions and the timing of its Guidance. App.52.

DPH's January 2024 press release, App.85–86, and its public "Avoid Anti-Abortion Centers" awareness campaign website, launched in June 2024, App.133, both solicit complaints against PRCs. The campaign webpage links directly to REN materials that identify and describe YOM by name. App.133. Consistent with the press release, the public campaign and REN materials describe PRCs as religious in nature, as posing a "serious threat," and as using "deceptive practices" and "disinformation." App.33–37. Another DPH webpage related to the public campaign

7

goes even further: "Even if you're not looking for an abortion, **these centers are not a safe or trusted place to go for reproductive health care.**" App.34.

In addition to their webpages, Defendants solicited complaints through multiple channels: government factsheets, a postcard developed for the public, and a letter to the editor from Defendant Goldstein to the Boston Globe. App.29, 45, 52. REN also solicited complaints in its "guidebook," which requested information from individuals with negative experiences at pregnancy resource centers, not limited to "patients" of these centers. App.36.

## C. Concrete Injuries to YOM and Its Religious Mission

The State's coordinated campaign has produced concrete, ongoing injury to YOM's operations, personnel, finances, reputation, and ability to carry out its religious mission. App.20, 27, 28, 57, 60, 66.

### 1. Loss of a Physician and Resulting Patient Turn-Aways

As a direct, immediate, and foreseeable result of Defendants' public campaign, one of YOM's doctors quit providing medical services for YOM. App.66. The physician's departure occurred against the backdrop of the DPH's January 2024 Guidance, expressly warning physicians and APRNs of professional discipline for medical practices associated with PRCs, App.30, 31; the simultaneous public branding of PRCs and the providers affiliated with them as "dangerous," "deceptive," and a "public health threat," App.28, 29, 32–33; and an ongoing Board

of Registration in Medicine investigation of YOM's medical director that has now stretched past two and a half years. App.27. The loss of the physician forced YOM to turn patients away and deny care to women who had come to YOM for help. App.66.

### 2. Continuing Investigation of YOM's Medical Director

YOM's medical director remains under investigation by the Board of Registration in Medicine, an investigation initiated because of Defendant Holder's October 2023 complaint and continuing as of the most recent hearing before the court below. App.27; Add.9 (noting that YOM "did relay during the motion hearing . . . that the Board's investigation into its medical director was still pending as of January 29, 2026").

The pendency of this investigation operates as an ongoing form of regulatory pressure. Each day the investigation remains outstanding, YOM and its medical director operate under the shadow of potential professional discipline (including loss of medical licenses) arising from a complaint filed by the State's own campaign partner.

### 3. Reduction in Clients

YOM has experienced a direct and immediate reduction in the number of women who come to its clinics seeking help. App.66. This reduction is the foreseeable—and expressly intended—consequence of a State-funded campaign that

placed billboards, posters, and transit advertising across the Commonwealth urging the public to "Avoid Anti-Abortion Centers," App.33; that maintained a DPH webpage stating, "**these centers are not a safe or trusted place to go for reproductive health care,**" App.34; and that linked from official government channels to REN materials identifying YOM by name and location, including a photograph of YOM's main clinic in Revere, Massachusetts. App.35–36. For a non-profit religious ministry that provides free pregnancy testing, ultrasounds, counseling, and material support to women facing unexpected pregnancies, App.22, a State-induced reduction in the client population strikes at the heart of what YOM exists to do.

### 4. Reputational Harm and Stigmatization

Defendants' official condemnation has branded YOM, by association and in materials naming YOM specifically, as "dangerous," "deceptive," a "fake clinic," and a "public health threat"—accusations broadcast through a $1 million state-funded campaign and amplified through REN's coordinated materials. App.24–25, 28–29, 31–36. This reputational injury persists notwithstanding DPH's February 29, 2024, finding that YOM had corrected all noted deficiencies and was in compliance, App.27, and notwithstanding YOM's twenty-five-year record of zero patient complaints. App.23. The State Defendants thus simultaneously cleared YOM through formal investigation while continuing publicly to portray PRCs as

dangerous and deceptive, including in materials identifying YOM by name. App.27, 35–36, 63. The continued branding of an entity as unsafe and deceptive after formally clearing its conduct is itself evidence that the campaign targeted viewpoint rather than conduct. App.25–27, 63.

### 5. Chilling Effect on Religiously Motivated Speech

YOM's mission is not solely operational; it is expressive. YOM exists, by its own founding mission, to offer pregnant women "help and support in choosing life[,]" App.21, and to share, consistently with its sincerely held Christian belief in the sanctity of human life, information about alternatives to abortion—including information about the use of progesterone for medication-abortion reversal. App.21, 22. The State's campaign has directly chilled that religiously motivated speech. YOM's remaining medical personnel now provide counseling and information under the cloud of multiple threats implicit in the campaign, App.57–60, and under the further cloud of an ongoing Board investigation of YOM's medical director. App.27. The Amended Complaint alleges that this combination has chilled YOM's willingness to engage in the very speech and counseling central to YOM's religious ministry. App.20, 31, 58, 60, 64, 66, 71.

### 6. Threat to YOM's Continued Operation

Taken together, the loss of a physician, the ongoing investigation of the medical director, the patient reduction, the reputational stigma, and the chilling of

YOM's religious counseling combine to create a credible threat to YOM's continued operation. App.66. YOM has alleged that, if the campaign continues unabated, it may be forced to shut down—not because it has done anything unlawful, but because the State has organized public, professional, and regulatory pressure against it because of its religious and pro-life viewpoint. App.20, 60, 66. The injuries already realized—physician departure, patient turn-aways, ongoing investigation, reputational damage, and reduced clientele—are ongoing and cumulative. App.60, 66.

**D.    Proceedings Below**

YOM filed suit under 42 U.S.C. § 1983 seeking declaratory, compensatory, and injunctive relief. The district court granted Defendants' motions to dismiss. Add.1. The court concluded that the State's campaign was permissible government expression, that YOM failed to allege any unconstitutional threat of enforcement, and that the campaign was not directed at YOM's religious or pro-life views.

**SUMMARY OF THE ARGUMENT**

The district court erred in dismissing YOM's claims at the pleading stage. The First Amendment prohibits government coercion of speech. Though the government may express its views—even forcefully—it may not deploy the machinery of the regulatory state to silence speakers it disfavors. Defendants branded all pro-life pregnancy centers—including YOM, a licensed medical facility with zero patient

12

complaints in twenty-five years—as unsafe, deceptive, and dangerous to public health. They appropriated $1 million to amplify that message through billboards, webpages, and mailings; issued regulatory Guidance with the express intent to "put anti-abortion centers on notice" of potential consequences for continuing their advocacy; partnered with a state-funded advocacy organization, which they described as their "trusted partner," to file the very complaints they then used as a pretext to open enforcement proceedings. Defendants further solicited additional complaints from the public while urging patients to avoid YOM's services entirely. That is *not* a public awareness campaign. That is a concerted governmental campaign to suppress disfavored expression.

The district court dismissed each element of this scheme as either permissible government speech or routine regulatory action. That approach was error twice over.

First, it misapplied the Rule 12(b)(6) standard by disaggregating a unified campaign into isolated pieces and drawing inferences against YOM. Second, it misapplied *Vullo* by failing to analyze the factual allegations holistically. When the Amended Complaint's well-pleaded facts are accepted as true, and all reasonable inferences are drawn in YOM's favor, this case not only falls within *Vullo* but exceeds it in scope and severity.

The Free Speech claim is more than plausible. All four *Vullo* factors are satisfied. The State's language is not political rhetoric. It includes legal terms of art

13

that signal imminent regulatory consequences. The government officials wielding that language hold direct authority over YOM's medical license, the operational foundation of everything YOM does. A physician resigned rather than face professional repercussions. YOM's medical director remains under investigation more than two years later, due to a complaint filed by the State's own campaign partner while that partner was simultaneously co-authoring DPH's regulatory Guidance. Those are not speculative injuries. They are the concrete, realized harms cognizable under the First Amendment. The Supreme Court's decision in *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 2026 U.S. LEXIS 1949, 146 S. Ct. 1114 (Apr. 29, 2026), further forecloses the district court's conclusion that YOM must wait for express threats of prosecution. *First Choice* held that a faith-based pregnancy center suffers a present, cognizable injury when government pressure chills its First Amendment activity. *Id.* YOM's injuries are not prospective; they are ongoing and realized.

The Free Exercise claim is equally plausible. PRCs like YOM would not have been targeted but for their religious view on abortion. In fact, internal government planning documents asked how officials wanted to "tackle/address religious aspects of these places." App.41. Under *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. 617 (2018), that statement of official hostility toward a religious actor's faith identity—embedded not in a passing remark but in the campaign's

14

foundational planning materials—is sufficient at the pleading stage to establish animus and require reversal.

The Equal Protection claim follows the same logic. The State launched its condemnation campaign against PRCs before it had received a single *independent* complaint against them. At the same time, it took no comparable action against abortion clinics that had failed health inspections for using non-sterile surgical equipment, storing biohazardous materials with food, and failing to verify patient vitals before anesthesia. The differential treatment is stark, and it readily supports the inference of viewpoint-based selective enforcement that Rule 12(b)(6) requires the district court to draw in YOM's favor.

Finally, the district court did not decide whether REN and Holder acted under color of state law, expressly declining to reach that question after dismissing the constitutional claims on other grounds. To the extent the court suggested REN could not participate in unconstitutional coercion because it lacked independent regulatory authority, that premise misstates YOM's theory. YOM alleges that REN acted as a willful participant in joint activity with state officials who indisputably possessed coercive authority over YOM's license and operations. The Amended Complaint plausibly alleges state action through joint participation, a close nexus and symbiotic relationship with the Commonwealth, and the State's use of REN to circumvent

constitutional limits on direct government action. Those theories remain unresolved and open on remand.

This Court should reverse.

## ARGUMENT

### I. Standard of Review

The standard of review governing a district court's grant of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is *de novo*. *Wilson v. HSBC Mortg. Servs., Inc.*, 744 F.3d 1, 7 (1st Cir. 2014). The fundamental question is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Douglas v. Hirshon*, 63 F.4th 49, 55 (1st Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In assessing whether YOM has stated a facially plausible claim to relief, this Court must accept as true the Amended Complaint's well-pleaded factual allegations and draw all reasonable factual inferences in YOM's favor. *McKee v. Cosby*, 874 F.3d 54, 58 (1st Cir. 2017).

The *de novo* standard carries particular force here because the district court's principal error was methodological, not merely factual. Rather than treating the Amended Complaint's allegations as a unified whole, as Rule 12(b)(6) requires, the court examined each component of Defendants' orchestrated campaign in isolation, resolved ambiguities in Defendants' favor, and only after dismissing each element

16

individually purported to consider the allegations collectively. That approach does not survive *de novo* review.

The Supreme Court addressed this precise methodological error in *NRA of Am. v. Vullo*, 602 U.S. 175 (2024). There, as here, the Second Circuit had disaggregated the NRA's allegations and characterized each component as either permissible government speech or legitimate enforcement action. The Supreme Court unanimously reversed, explaining that the lower court "could only reach this conclusion by taking the allegations in isolation and failing to draw reasonable inferences in the NRA's favor[.]" *Id.* at 194. The Court's instruction is unambiguous: at the pleading stage, the facts underlying a First Amendment coercion claim must be assessed as a whole.

## II.     The Amended Complaint Plausibly Alleges a Violation of YOM's Right to Free Speech Under the First Amendment

"At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Vullo*, 602 U.S. at 187. *See also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."). Indeed, take away the freedom to "'stimulate competition' in the marketplace of ideas . . . and 'dissident expression' stands particularly vulnerable to marginalization or outright

17

'suppression by the majority,' leaving all of society poorer for it." *First Choice*, 2026 U.S. LEXIS 1949, at *14 (citation omitted).

While government officials may, under the First Amendment, "share [their] views freely and criticize particular beliefs," they may not "use the power of the State to punish or suppress disfavored expression." *Vullo*, 602 U.S. at 188. Further, the Supreme Court recently affirmed that First Amendment protections apply with equal force to the speech of licensed medical providers such as YOM and its medical director. In *Chiles v. Salazar*, 146 S. Ct. 1010, 1029 (2026), the Court emphasized that licensed professionals "'have a host of good-faith disagreements' about the 'prudence' and 'ethics' of . . . practices in their field[,]" and warned that allowing the government to silence speech that deviates from prevailing medical orthodoxy would enable the easy suppression of dissenting professional views. The First Amendment, the Court explained, rests on the foundational truth that "'the people lose' whenever the government transforms prevailing opinion into enforced conformity." *Id.* at 1029 (internal citations omitted).

Here, Defendants' statements cross the line from voicing an opinion or policy stance to making unconstitutional coercive threats through accusations of illegal activity. Defendants' conduct violates the Free Speech Clause on two independent grounds. First, under *Vullo*'s threat analysis framework, Defendants' conduct satisfies all four factors for finding unconstitutional coercion. Second, their

campaign has already succeeded in chilling YOM's speech through concrete, retaliatory harm.

### A. The First Amendment Prohibits Government Officials from Using Regulatory Power to Coerce or Suppress Disfavored Speech

The First Amendment draws a clear line between government speech and government coercion. On one side: advisories, hotlines, public health campaigns, even forceful criticism of disfavored speakers. On the other: using the machinery of the regulatory state—legal terms of art like "deceptive advertising," "public health threat," and "inconsistent with accepted practice"—to signal imminent enforcement consequences to speakers the government wants silenced. That line is crossed all the more decisively when the officials deploying that language hold direct authority over the speaker's license, pair it with active complaint solicitation, and issue regulatory Guidance expressly designed to place that speaker on notice.

Government *speech* is permissible; *threats* are not. In *Bantam Books*, *Inc. v. Sullivan*, 372 U.S. 58 (1963), where the government "publicly denounced as objectionable materials which failed to meet with its approval, and threatened distributors of the materials with prosecution," *State Cinema of Pittsfield, Inc. v. Ryan*, 422 F.2d 1400, 1401 (1st Cir. 1970) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)), the Supreme Court held that the First Amendment prohibits government officials from relying on the "threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression" of disfavored speech.

*Bantam Books,* 372 U.S. at 67. In *Vullo*, the NRA prevailed on a First Amendment claim of coercion after DFS Superintendent Vullo informed insurance companies that the agency would be "less interested" in pursuing regulatory violations if they ceased providing insurance to the NRA, while also urging them to take "prompt actions" against NRA-related risks. 602 U.S. at 183–184. Vullo framed these "reputational risks" as threats to "public health and safety." *Id.* at 184.

As the Second Circuit succinctly summarized the difference between permissible speech and unconstitutional threats:

> What matters is the distinction between attempts to convince and attempts to coerce. A public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or, misuse) of the defendant's direct regulatory or decisionmaking authority over the plaintiff, or in some less-direct form.

*Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003); *see also Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) ("[i]t is antithetical to a free society for the government to give 'one side of a debatable public question an advantage in expressing its views to the people.'" (citation omitted)).

The decision below mirrors the error the Supreme Court corrected in *Vullo*. There, the Second Circuit had "concluded that Vullo's alleged actions constituted permissible government speech and legitimate law enforcement, and not

20

unconstitutional coercion." 602 U.S. at 186. The Supreme Court unanimously reversed, explaining:

> The Second Circuit could only reach this conclusion by taking the allegations in isolation and failing to draw reasonable inferences in the NRA's favor in violation of this Court's precedents. . . . Given the obligation to draw reasonable inferences in the NRA's favor and consider the allegations as a whole, the Second Circuit erred in reading the complaint as involving only individual instances of "permissible government speech" and the execution of Vullo's "regulatory responsibilities."

*Id.* at 194–95. The same flaw pervades the decision below. By disaggregating Defendants' calculated campaign into isolated components, resolving ambiguities against YOM rather than in its favor, and only then purporting to consider the facts "collectively," the district court committed the very error *Vullo* forbids. Viewed as a whole and with all reasonable inferences drawn in YOM's favor, the Amended Complaint's well-pleaded facts state a First Amendment claim under *Vullo's* four-factor analysis.

### B. Defendants' Coordinated Campaign Satisfies *Vullo*'s Four-Factor Coercion Framework

The governing question under *Vullo*, viewed according to the totality of circumstances, is whether a reasonable regulated speaker would understand the State's conduct as threatening enforcement on account of a disfavored viewpoint. That inquiry weighs the totality of the circumstances across four factors: (1) word choice and tone, (2) regulatory authority, (3) perception, and (4) adverse

consequences. *Vullo*, 602 U.S. at 189–90; *Bantam Books*, 372 U.S. at 66–68. On every factor, viewed together and in context, Defendants crossed that line: branding PRCs as dangerous to the public, actively soliciting complaints against them, threatening regulatory consequences, and orchestrating a public intimidation campaign that has chilled YOM's protected speech.

### 1.      Word Choice and Tone

The first *Vullo* factor is the government actor's word choice and tone. The Amended Complaint alleges a multi-pronged coordinated campaign featuring enforcement-laden rhetoric that branded PRCs, including YOM, as wrongdoers. App.24–25, 28–29, 31–33. That rhetoric was amplified through official DPH webpages that warned the public against seeking services from PRCs, actively solicited complaints against them, and linked directly to REN materials that named YOM specifically, included a photo of one of its clinics, and described PRCs as organizations that "may mislead you or delay your care," "could put your health at risk," and are "**not [] safe or trusted place**[s]." App.33–37. The campaign also included billboards, posters, and other signs posted across the Commonwealth spreading the same message. App.33.

Defendants' choice of words goes far beyond mere disagreement or criticism. Even after YOM was investigated and found spotless, Defendants repeatedly branded YOM and other PRCs in State advertisements, press releases, and public

statements as engaging in "deceptive advertising"—conduct prohibited by Massachusetts medical regulations barring advertising "that is false, deceptive, or misleading[.]" 243 Mass. Code Regs. § 2.07(11)(a)(1). By categorically branding all PRCs as engaging in "deceptive advertising," Defendants applied a regulatory term of art that triggers specific legal consequences. In *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231–32 (7th Cir. 2015), the Seventh Circuit found that a sheriff crossed a line in part because a threatening letter he sent used legal terminology and relied on the federal money-laundering statute, 18 U.S.C. § 1956. As in *Backpage.com*, the State Defendants' threats that make "ominous reference" to potential legal liability cross the First Amendment line. *Id.* at 234.

Similarly, "public health threat" carries legal significance beyond mere political rhetoric. Massachusetts courts use this precise terminology to describe genuine regulatory emergencies, such as "the transmission of blood-borne diseases by intravenous drug abusers." *Commonwealth v. Landry*, 438 Mass. 206, 209 (2002). When the State's chief health officer officially declares PRCs "a public health threat," reasonable observers understand this as a finding that triggers regulatory intervention and punishment, not an expression of political disagreement.

The state-funded campaign repeatedly used incendiary language to portray PRCs as predatory, dangerous, and deceitful—accusing them of "disinformation," and posing "serious threat[s]." App.35–38. Defendants' planned messaging claimed

23

PRCs "LIE to your face," "may mislead you or delay your care," and "could put your health at risk." App.34, 54. Defendant Governor Healey said the campaign aimed to "protect[] patients from **the deceptive and dangerous tactics that anti-abortion centers often use[.]**" App.32. Other campaign materials branded PRCs as a "WOLF IN SHEEP'S CLOTHING," asserting they assume "a false identity" to "deceiv[e] their patients, preying on fear, sowing the seeds of doubt and shame[.]" App.44. Slogans like "FREE ISN'T ALWAYS FREE" were used to claim that free services from PRCs "come at a very steep price—your health, your options, and your future." App.44. Materials stated that PRCs' "lies impact your life" and that they "will try to influence patients' care choices, judge decisions, and delay you from accessing comprehensive care." App.44.

Far from mere criticism or protected government speech, Defendants' statements represent the State's use of official authority to brand PRCs, including YOM, as unlawful and dangerous, thereby facilitating further regulatory pressure and enforcement actions against them.

The language Defendants use to stigmatize PRCs is far stronger than the language used to support liability in *Vullo*. Vullo merely "encourage[d]" entities to evaluate the "reputational risks[] that may arise from their dealings with the NRA[.]" *Vullo*, 602 U.S. at 176. Defendants, on the other hand, have publicly classified PRCs as dangers to public health. Defendants' own words did not merely criticize some

PRCs; they attacked *all of them*. While the legal standard governing First Amendment coercion does not impose bright-line rules, one principle that does emerge is that word choice accusing an entity of criminal activity is more than run-of-the-mill criticism. *Backpage.com,* 807 F.3d at 238. And that is exactly the word choice here.

The district court erred in its analysis of the Defendants' word choice and tone by isolating each public statement as mere "opinion" or protected "government speech" and denying the cumulative effect of this coordinated campaign. Add.2–3, 23–25, 30, 41–42. The court characterized the statements as "broad, public-facing campaign statements criticizing the practices of PRCs generally[,]" Add.3, while ignoring the Amended Complaint's detailed allegations—supported by internal documents and the campaign's own structure—that these statements were part of a unified, intentional effort to brand YOM and all other PRCs as dangerous and deceptive because of their religious pro-life viewpoint and refusal to provide abortions. App.24–25, 28–29, 32–37. The fact that the campaign targeted an entire category of pro-life centers does not diminish its unconstitutional nature; it reinforces it. A campaign that sweeps in every provider of a disfavored viewpoint, regardless of individual conduct, is the State declaring a viewpoint itself to be the offense.

In treating the accusations of wrongdoing as mere isolated opinions, the lower court failed to draw the reasonable inference that a licensed provider like YOM would perceive these statements—issued by the very regulators with authority over its license—as enforcement-laden warnings, especially when paired with complaint solicitation, regulatory Guidance, and REN's complaints used to justify enforcement timing.

A comparison with *Bantam Books* underscores the strength of YOM's claim. The state commission in that case sent letters to distributors notifying them that listed publications were "objectionable" and noting the commission's duty to recommend violations to the Attorney General. 372 U.S. at 62–63. There was no express threat; no regulatory Guidance; no coordinated public campaign; no complaint solicitation; and no government-funded advocacy partner naming specific targets. The Supreme Court nonetheless held that conduct constituted unconstitutional coercion. *Id.* at 66–68. If coercion was present in *Bantam Books* without any of those aggravating features, it is indisputably present here with all of them.

In a recent and similar case, the Second Circuit reversed the dismissal of First Amendment claims brought by pro-life pregnancy centers against the New York Attorney General. *See Nat'l Inst. of Family & Life Advocs. v. James*, 160 F.4th 360 (2d Cir. 2025). There, as here, state officials targeted PRCs based on their pro-life viewpoint and speech. *Id.* at 374–75. The government's conduct in this case is, if

26

anything, more sweeping: Massachusetts did not merely investigate specific medical claims—it launched a $1 million public awareness campaign and partnered with a pro-abortion advocacy group to brand PRCs as dangerous, solicit complaints, and use those complaints to justify further regulatory pressure.

The district court's contrary conclusion appears to rest, in part, on its observation that YOM concedes that Defendants possess free speech rights to state their views as well as criticize opposing views, even with strong language. Add.2. YOM has never disputed that basic proposition. What YOM challenges is Defendants' use of the *power of the State* to suppress disfavored expression. As explained in detail above, the Defendants crossed the line from permissible speech to unconstitutional suppression of a disfavored viewpoint, accusing PRCs of engaging in dangerous and illegal activity via legal terms of art and exerting the coercive power of the State by threatening them with legal consequences for engaging in protected religious speech.

### 2. Regulatory Authority

Defendants wield far more direct regulatory power over YOM than Superintendent Vullo exercised over insurance companies. Here, the statements at issue come directly from State authorities that wield regulatory authority, such as the Governor and the DPH Commissioner. Commissioner Goldstein, as the head of the DPH, directly controls YOM's medical license, the foundation of its operations.

Goldstein explicitly threatened to "**jeopardize a clinic license through administrative action including licensure suspension or revocation**" and warned that entities "**may be referred to the Attorney General's Office by DPH for prosecution[.]**" App.30. He specifically singled out pro-life clinics and their practices. "Generally speaking, the greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official." *Vullo*, 602 U.S. at 191–92. When officials with such direct power publicly brand an entity as "dangerous" and a "public health threat," observers understand this as a regulatory threat, not mere commentary.

In *Bantam Books, Inc.*, the Supreme Court held that a state commission's practice of notifying distributors of objectionable publications and referring non-compliant distributors to the Attorney General constituted unconstitutional coercion—even though the commission had no independent enforcement authority of its own. 372 U.S. at 72. The Court looked to the coordinated relationship between the commission's informal pressure and the formal prosecutorial power standing behind it. *Id.* at 67–68. Here, that relationship is even more direct. *See Okwedy*, 333 F.3d at 343 ("[T]he existence of regulatory or other direct decisionmaking authority is certainly relevant to the question of whether a government official's comments were unconstitutionally threatening or coercive . . . .").

The use of government investigation and subpoena power as instruments of regulatory pressure is itself a recognized form of First Amendment coercion. The Supreme Court has long held that the compulsory process of official investigation, when wielded against a disfavored speaker, may chill the exercise of constitutional rights even absent formal prosecution. *Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 556-57 (1963). In *Gibson*, the Court held that government compulsion constitutes an unconstitutional burden on First Amendment rights when it singles out speakers based on their views. *Id.* at 557–58. The same principle applies here. The two broad subpoenas issued to YOM's medical director—initiated through a complaint from the State's own campaign partner—transformed DPH's public condemnation into concrete professional jeopardy for the individual providing YOM's medical services.

The district court erred in concluding that the Amended Complaint does not plausibly allege that YOM was targeted for regulatory enforcement action. Add.49. But the well-pleaded facts demonstrate precisely such targeting. Not only was YOM investigated (and subsequently cleared) by DPH, but the Board of Registration in Medicine has been investigating YOM's medical director since 2023 on the basis of that same complaint, resulting in two broad subpoenas issued to YOM. App.27. The DPH Guidance specifically singled out medical professionals who offer or provide progesterone to counteract abortion pills, App.30, 31, 64–65, threatening them with

penalties. This targeting occurred even though the use of progesterone to support at-risk pregnancies and assisted reproductive technologies is lawful in Massachusetts. App.30.

Even the district court acknowledged key internal evidence of targeting, noting that DPH's draft Guidance "do[es] put anti-abortion centers on notice." Add.11. Contrary to the district court's conclusion, that internal admission together with the timing of REN's complaints, the launch of the public awareness campaign, and Defendants' public statements about the Guidance, confirm that the Guidance was not a neutral reminder sent to all licensees. It was instead a deliberate component of a coordinated effort to threaten and chill the pro-life speech of PRCs because of their viewpoint and religious character.

The DPH deliberately echoed the very language of "false," "misleading," and "deceptive" practices that permeated Defendants' public awareness campaign, press releases, and press conferences. App.85–86 (consumer advisory issued "warning patients seeking reproductive health services about the limited and potentially misleading nature of the services provided by crisis pregnancy centers[,]" and "[PRCs] often provide inaccurate and misleading information about abortion and the medical and mental health effects of abortion[]"); App.93–94 ("[YOM] may be engaging in deceptive practices[,]" and "[YOM] appears to engage in intentionally misleading and deceptive practices . . . ."); App.101 (Defendant Healey indicating

that the state is "protecting patients from the deceptive and dangerous tactics that anti-abortion centers often use to stop people from accessing [abortion]." Lieutenant Governor Kim Driscoll stated, "[t]he troubling practices of anti-abortion centers serve to undermine the trust that people should have in our health care system[.]"). App.101. When read in context with the same-day press release targeting "anti-abortion centers," the "Avoid Anti-Abortion Centers" webpage and public awareness campaign, and REN's coordinated materials, the Guidance left no doubt that YOM and other PRCs were its intended audience.

A reasonable medical provider or clinic administrator reading the Guidance would understand that they—and not abortion providers or licensed medical professionals in general—were the ones being placed "on notice." This deliberate mirroring of the campaign's inflammatory rhetoric and unfounded allegations transformed what the district court called a "generic regulatory reminder" into a pointed warning: continuing to operate consistently with your pro-life mission and religious beliefs carries the risk of professional discipline.

The relevance of the officials' regulatory authority over YOM is thrown into sharp relief by comparing this case to *Okwedy*, where the Second Circuit found a plausible coercion claim despite the *absence* of any direct regulatory authority. *Okwedy*, 333 F.3d at 344. There, a borough president sent a letter urging a billboard company to remove a religious advertisement. Even though he had no regulatory

31

power over the company, the court nonetheless held that an official's ability to cause collateral harm through the levers of government creates the coercive dynamic the First Amendment prohibits. *Id.* Here, Commissioner Goldstein did not merely hold an office—he directly controlled YOM's medical license, the operational foundation of everything YOM does. If indirect pressure from an official with *no* authority over the speaker sufficed in *Okwedy*, direct licensing authority paired with public condemnation and complaint solicitation satisfies *Vullo* many times over.

### 3. Perception

Third, Defendants' speech was understood as a threat. As discussed *supra*, the Amended Complaint contains detailed, non-conclusory allegations—supported by Defendants' own documents—demonstrating both Defendants' intent and YOM's reasonable perception that Defendants' conduct carried the implicit threat of discipline for its religiously motivated speech and practices. DPH employees explicitly tied the DPH Guidance to putting "**anti-abortion centers on notice.**" App.29, 46–47.

The governing standard under this factor is whether a reasonable person in the regulated party's position would understand the government's communications as threatening enforcement on account of disfavored expression, and the reaction "further confirms the communications' coercive nature." *Vullo*, 602 U.S. at 193; *see also Backpage.com*, 807 F.3d at 234–35; *Rattner v. Netburn,* 930 F.2d 204, 210 (2d

32

Cir. 1991) (noting that "a threat was perceived and its impact was demonstrable."). The *Backpage.com* court emphasized that the relevant perspective is not an abstract reasonable person but a reasonable actor who is subject to the regulator's authority— one who understands that the official making the statement controls the license, the inspection calendar, and the referral to the Attorney General. *Id.* at 234–35.

Applying that standard here, no reasonable licensed medical provider—upon receiving a Guidance document named "Guidance on Anti-abortion center," issued the same day as a press release warning of investigations, by the Commissioner who controls its medical license—would have concluded anything other than that it was the intended target. The simultaneous launch of a public awareness campaign featuring billboards urging the public to avoid PRCs, while soliciting complaints against them through multiple channels, would only have confirmed that perception. The Supreme Court in *Bantam Books* found coercion from letters that contained no explicit threat of prosecution—only a notification that publications had been listed and a reminder of the commission's duty to refer violations. 372 U.S. at 62–63. The communications here are categorically more direct.

When viewed in the context and timing of the concerted campaign, the regulatory Guidance signals to any reasonable observer that compliance with the State's preferred viewpoint is required. It was issued on the same day as DPH's press release that publicly singled out "anti-abortion centers" and warned of

investigations. App.28–29. That message was further amplified by the launch of Defendants' high-profile public awareness campaign, which featured billboards, posters, official webpages, and complaint solicitation. App.31–33, 33–37.

YOM and its staff reasonably perceived the combination of the State's inflammatory and baseless public rhetoric, targeted regulatory Guidance, complaint solicitation, and its close public partnership with the state-funded REN, as a direct threat of enforcement action against their pro-life viewpoint and religious mission. App.20, 31, 64. This perception produced concrete chilling effects on YOM's protected First Amendment speech and operations (discussed in detail *supra*). App.20, 31.

In reaching its contrary conclusion, the district court rejected the publicly visible file name of the Guidance document—"Guidance on Anti-abortion center and standard of care reminder guidance – 1.3.2024"—as merely an "internal" consideration "known only by its drafters." Add.29–30. This cannot be reconciled with the Amended Complaint, which alleges that the file name was linked and publicly available on the DPH website. App.29. Any licensed physician, nurse, or clinic operator would naturally perceive a file explicitly named "**Guidance on Anti-abortion center[,]**" issued the same day as a press release targeting "anti-abortion centers," as viewpoint-targeted. App.28–29. This is precisely the type of converging evidence that *Vullo* instructs courts to weigh when assessing perception and

underscores the reasonableness of YOM's perception that it was being targeted. 602 U.S. at 189.

Furthermore, the district court brushed aside internal DPH communications, confirming that the Guidance was intended to "**put anti-abortion centers on notice[,]**" App.46–47, as irrelevant deliberative thoughts never communicated externally. Add.30. This reasoning is flawed in multiple respects. First, it ignores that YOM's reasonable perception of targeting arose from the campaign *as a whole* long before those specific internal documents were obtained through a public records request. Second, those internal statements confirm and reinforce the reasonableness of YOM's perception: they demonstrate that the targeting was not imagined by YOM but was in fact the very purpose of the Guidance. Third, by treating the government's internal intent as categorically irrelevant, the court effectively held that DPH could internally design a campaign to target disfavored speakers so long as it veiled that purpose well enough on the surface. That approach flies in the face of *Vullo*.

The district court repeatedly drew inferences against YOM and based its "holistic" analysis on the individual findings. This methodology—disaggregating the facts and inverting the inference standard—cannot be reconciled with the pleading requirements of *McKee v. Cosby*, 874 F.3d at 58, and *Vullo*, 602 U.S. at 191. Instead, the facts as alleged in the Complaint plausibly demonstrate that YOM

reasonably perceived Defendants' conduct as threatening regulatory consequences in response to its protected speech.

### 4. Adverse Consequences

Supreme Court precedent is clear: merely the "threat of invoking legal sanctions and other means of coercion[]" may create the danger of a chilling effect upon the exercise of vital First Amendment rights. *Bantam Books, Inc.*, 372 U.S. at 67. The coordinated campaign produced concrete chilling effects that constitute a cognizable First Amendment injury.

While the Guidance marked the beginning of the public campaign against PRCs, the threat extended well beyond the regulatory Guidance itself. It was issued on the same day as DPH's press release that publicly highlighted "anti-abortion centers" and warned of investigations. App.28–29. This was followed by the launch of the public awareness campaign labeling PRCs as dangerous to the public. App.31–33, 33–37. The coordinated pressure directly caused YOM to suffer a drop in clients, the resignation of a doctor, the continued investigation of its medical director based on REN's complaint, subpoena requests supporting that investigation, and the burden of operating in a persistent climate of fear and harassment. App.20, 27, 60, 66. This was not a neutral public awareness effort. It was a targeted campaign designed to deter patients from YOM's services and to silence its pro-life speech and religious mission.

The totality of facts demonstrates that Defendants have crossed the line into coercion. Actions that appear independently lawful may, in the aggregate, form an overall practice that violates the First Amendment. *See Vullo*, 602 U.S. at 196. The Court explained that "although Vullo can pursue violations of state insurance law, she cannot do so in order to punish or suppress the NRA's protected expression. So, the contention that the NRA and the insurers violated New York law does not excuse Vullo from allegedly employing coercive threats to stifle gun-promotion advocacy." *Id.* Likewise, Massachusetts can set up a hotline, issue warnings, or investigate fraud. But it *cannot* carry out those acts in a viewpoint-discriminatory fashion to threaten the religious speech and activities of PRCs. A campaign of viewpoint-discriminatory threats and intimidation cannot hide behind Defendants' regulatory authority. The facts alleged, viewed in the light most favorable to YOM, are sufficient to state a claim for a violation of the First Amendment. *See, e.g.*, *Rattner*, 930 F.2d at 210 (holding that "[t]he district court's ruling that the language of the [defendant's] letter, either standing alone or in all the circumstances, is not a veiled threat of boycott or reprisal does not view that language in the light most favorable to [the plaintiff] as the nonmoving party.").

The district court asserted that YOM failed to allege any "express, coercive threats" by Defendants. Add.22–23, 29. But the First Amendment does not require an explicit "stop speaking" command. The coordinated campaign—pairing the DPH

37

Guidance's warnings about progesterone and "deceptive practices" with a public awareness effort branding PRCs as dangerous and misleading—sent a clear implicit message: continue operating according to your pro-life and religious beliefs at your peril. *See Bantam Books*, 372 U.S. at 67; *Vullo*, 602 U.S. at 189–90. The Amended Complaint contains detailed factual allegations of concrete harm flowing directly from the campaign discussed more fully in the Statement of the Case, *supra* at 6–8.

The district court's attempt to distinguish this case from *Bantam Books* fails because there is little meaningful difference between "brandish[ing] potential enforcement action" and placing regulated parties under threat of enforcement when the government is targeting disfavored conduct. Add.29. The decision below itself acknowledges that the Guidance singled out abortion pill reversal as "unproven, unethical, and unsafe," while simultaneously warning licensees that they were "facing enforcement action" and soliciting complaints for investigation. Add.28–29. The underlying laws here—medical licensing regulations—may be generally applicable in theory, just as Rhode Island's obscenity laws in *Bantam Books* were, but that does not immunize the government from constitutional scrutiny when those laws are wielded to target a specific disfavored viewpoint or activity. 372 U.S. at 59–60.

By treating the Guidance as a neutral directive applicable to "all" licensees, while overlooking that it specifically singled out lawful pro-life practices such as

abortion pill reversal, the district court failed to analyze the campaign in its full context and ignored the plausibly coercive effect of these "thinly veiled threats." *See also Vullo*, 602 U.S. at 190 (requiring a fact-intensive, totality-of-the-circumstances analysis of unconstitutional coercion).

The district court repeatedly emphasized the absence of threatened criminal prosecution when distinguishing this case from *Vullo* and *Backpage.com*. *See* Add.43 ("does not reasonably indicate or imply that PRCs would face criminal prosecution"); Add.44 ("neither conveyed any demands nor hinted at potential criminal prosecution"; "no allegations that state officials threatened any third parties with prosecution"); Add.50 ("Nor do they show that officials brandished criminal prosecution"). However, that framing imports a criminal-prosecution element that neither *Vullo* nor *Bantam Books* requires. *See* Add.43, 44, 50. As *Vullo* affirms, the First Amendment prohibits government officials from relying on the "threat of invoking *legal sanctions and other means of coercion*" to suppress disfavored speech. 602 U.S. at 189 (quoting *Bantam Books*, 372 U.S. at 67) (emphasis added). *See also Backpage.com,* 807 F.3d at 231–32 (finding an implied threat of coercive state power sufficient to chill speech, without requiring direct threats of criminal prosecution).

In *Vullo*, the Supreme Court asked whether the challenged communications "refer[] to adverse consequences," 602 U.S. at 189; a category that plainly

encompasses the loss of professional licensure, civil enforcement by the Attorney General's Civil Rights Division, Board of Registration disciplinary proceedings, and unannounced inspections by DPH. Add.43; *see also* App.27, 29, 30, 48, 57–58. The threat of having one's license revoked or one's clinic shuttered is, for a regulated medical provider, no less "adverse" than a threat of prosecution, and that is what Defendants have threatened here. App.30, 31, 46–47.

The district court's rejection of these well-pleaded allegations as "conclusory" and its failure to view the campaign holistically repeats the error corrected in *Vullo*. *See* 602 U.S. at 189–90. When the Amended Complaint's allegations are properly assessed as a whole and with all reasonable inferences drawn in YOM's favor, they plausibly state a claim of unconstitutional coercion.

### C. The Coordinated Campaign Has Chilled YOM's Speech Through Concrete Harm

Religious speech and advocacy on matters of profound public concern lie at the core of the First Amendment, and "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 11 (1972). Governmental action may be challenged even when it only indirectly burdens First Amendment rights. *Id.* at 12–13. The Constitution protects "not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Bates v. City of Little Rock*, 361 U.S. 516, 523

40

(1960). *See also Hankard v. Town of Avon*, 126 F.3d 418, 423 (2d Cir. 1997) (stating that "governmental action which falls short of a direct prohibition on the free exercise of speech may be subject to constitutional challenge"); *Levin v. Harleston*, 966 F.2d 85, 89–90 (2d Cir. 1992) (holding university's implicit threats of future censure against faculty sufficient to violate First Amendment rights).

Nor must a plaintiff wait for formal enforcement before challenging government conduct that chills protected speech: "a party need not always wait for the government to take coercive action against it before filing suit to challenge the government's conduct. Instead, a litigant may bring a pre-enforcement suit seeking prospective relief against government officials so long as it faces 'a credible threat of enforcement.'" *First Choice*, 2026 U.S. LEXIS 1949, at *12  (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161, 164–67 (2014)).

The Supreme Court's recent decision in *First Choice* confirms the cognizability of YOM's injuries. There, the Court held that a faith-based PRC suffered a present, cognizable injury to its First Amendment rights when the government's demands burdened those rights, even absent formal enforcement. Such demands, the Court emphasized, "discourag[e] people from associating with groups engaged in protected First Amendment advocacy" and "encourage groups and individuals to cease or modify protected First Amendment advocacy the government disfavors." *Id*. at *19–20 (internal quotation marks and citation

41

omitted). And that injury arises "not just when a demand is enforced, but when it is made and for as long as it remains outstanding." *Id*. at *20.

The facts here are materially analogous. As discussed *supra*, the State's coordinated campaign has already caused concrete, ongoing harm to YOM: a physician resigned rather than risk professional repercussions; YOM has turned away patients and experienced a measurable decline in clients; and its medical director remains under a prolonged Board of Registration in Medicine investigation triggered by a complaint from the State's own campaign partner. App.20, 27, 60, 66. These realized injuries fall squarely within the categories of cognizable chilling the Supreme Court recognized in *First Choice*. The district court's contrary conclusion—that YOM must experience express threats of prosecution—cannot be reconciled with that decision.

The campaign has also deterred YOM from fully engaging in its religiously motivated speech. Faced with ongoing investigation and the threat of further regulatory consequences, YOM has been forced to operate under a continuing cloud of government scrutiny that chills its ability to speak freely. App.58, 60, 63, 64, 66, 71. The First Amendment protects against precisely this form of self-censorship. *See Va. v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) ("[T]he alleged danger of [the challenged statute] is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution.").

**III. The Amended Complaint Plausibly Alleges a Violation of YOM's Right to Free Exercise of Religion Under the First Amendment**

The same coordinated campaign that violated YOM's free speech rights was also driven by hostility toward its religious identity. The Free Exercise Clause prohibits official action that targets religious conduct for disfavored treatment. *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 534 (1993). As the Supreme Court explained, "the government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief[.]" *Id.* at 543. Even a single statement of official hostility towards a religious actor's beliefs, made by a decision-maker with authority over that actor, can establish the animus sufficient to invalidate otherwise facially neutral government action. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. 617, 634–36 (2018) (finding that commissioners' derogatory remarks about religion during the adjudication process demonstrated impermissible hostility and required invalidation of the decision).

Here, the Amended Complaint plausibly alleges such targeting. Defendants' campaign singled out PRCs, most of which are faith-based, for disparate treatment because of their religious expression and pro-life viewpoint rooted in the belief in the sanctity of human life. App.22, 28, 71. The district court's characterization of the campaign as practice-focused rather than religion-focused is contradicted by Defendants' own documents. The DPH's January 2024 press release did not merely

43

criticize medical practices at PRCs—it criticized PRCs for being "**affiliated with . . . religious organizations** advanc[ing] an anti-abortion agenda." App.28. The press release thus made religious identity a stated basis for the State's concern. A government agency that publicly identifies a class of regulated providers by their religious affiliation and then launches an enforcement-adjacent campaign against them has not acted neutrally toward religion.

Internal campaign planning documents explicitly asked, "How do we want to tackle/address religious aspects of these places." App.41. Even after DPH formally cleared YOM of deficiencies, the Commonwealth continued to publicly brand it as "dangerous" and "deceptive" in materials naming YOM specifically. App.27, 63. At the same time, Defendants launched no comparable campaign against secular abortion providers despite documented complaints and serious inspection failures. App.49–51.

The burdens alleged are concrete. The campaign subjected YOM to regulatory threats tied to its religiously motivated speech, created a hostile regulatory environment, and pressured it to conform its message to the State's preferred view. It also stigmatized YOM's religious beliefs through official messaging that labeled PRCs "dangerous" and misleading. App.8, 31, 32, 35, 38, 42, 50, 58, 59, 60–61. The district court erred in dismissing this claim. The court concluded that

> [t]he campaign focused on combatting the arguably deceptive and out-
> of-scope practices of some PRCs, not all of which are even religiously

affiliated according to YOM. There is no allegation that Defendants singled out religious PRCs for worse treatment than non-religious PRCs.

Add.53–54. This very phrasing reveals again the district court's fundamental error: by characterizing the practices as "arguably deceptive," the court drew inferences against YOM and resolved contested factual issues in Defendants' favor at the pleading stage. That approach violates foundational Rule 12(b)(6) requirements. *See Iqbal*, 556 U.S. at 678; *Vullo*, 602 U.S. at 191.

The district court further concluded that the campaign was directed at the practices of PRCs rather than their religious beliefs or character and that nothing in the record suggests that Defendants' actions were motivated by hostility toward religion. Add.54–55. On the contrary, as discussed above, the Complaint included extensive evidence of religious animus that the district court ignored: evidence that Defendants were specifically trying to target the "religious aspects" of PRCs. App.41.

The lower court characterized the campaign as reflecting legitimate secular concerns about consumer protection and public health and found the internal document addressing religious aspects of PRCs insufficient to show animus. Add.53–55. In so doing, it failed to accept the allegations of the Complaint as true and instead acted as trier of fact. The district court failed to credit, for example, the Complaint's allegation that Defendants' *public* communications specifically

criticized PRCs for their religious affiliation. App.28. This analysis fails to credit YOM's well-pleaded allegations, minimizes clear evidence of religious targeting, and misapplies *Masterpiece Cakeshop* and *Lukumi*.

Contrary to the decision below, the Amended Complaint contains multiple specific allegations showing that Defendants and REN expressly targeted the religious character of PRCs. For example, REN's guidebook—which the Commonwealth's own webpage expressly links to and directs members of the public to consult for more information on PRCs—warns that anti-abortion centers "are typically managed and funded by national religious organizations that oppose abortion in any and all circumstances." App.34, 35, 153. That guidebook—published on an official government-linked resource and used as part of a state-funded public awareness campaign—lists religious imagery, spiritual support, and bible study among the deceptive tactics these centers allegedly employ. App.153. The guidebook used YOM as a concrete example, naming YOM's facilities and including a photograph of its Revere clinic. App.35–36. Campaign planning documents further used YOM's website as the illustrative example of typical PRC messaging and labeled it in a map contrasting "AACs v. Real Clinics in MA." App.42. The State may not disclaim responsibility for content it chose to incorporate into its own campaign and directed the public to read.

These allegations, taken together and viewed with all reasonable inferences in YOM's favor, demonstrate that the Commonwealth's campaign was motivated, at least in part, by hostility toward the religious identity and mission of PRCs like YOM. The district court's analysis of this claim repeats the same fundamental error as its Free Speech analysis. As discussed *supra*, the court examined each component of the State's campaign in isolation, drew inferences against YOM rather than in its favor, and only after dismissing each allegation individually attempted to consider them collectively.

## IV. The Amended Complaint Plausibly Alleges an Equal Protection Violation

The Equal Protection Clause prohibits viewpoint discrimination against similarly situated entities and contemplates that similarly situated persons are to receive substantially similar treatment from their government. *See Barrington Cove Ltd. P'ship v. R.I. Hous. and Mortg. Fin. Corp.*, 246 F.3d 1, 7 (1st Cir. 2001). "When speakers and subjects are similarly situated, the State may not pick and choose." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 55 (1982) (discussing Equal Protection Clause); *see also Tapalian v. Tusino*, 377 F.3d 1, 7 (1st Cir. 2004) (holding that plaintiff successfully showed that city officials violated the Equal Protection Clause by a "malicious orchestrated campaign"). Here, although abortion clinics and PRCs are similarly situated providers offering pregnancy-related services, Defendants subjected only PRCs to targeted warnings, public

condemnation, and coordinated regulatory pressure. In doing so, Defendants discriminated against PRCs, including YOM, because of their religious and pro-life viewpoint.

To state a selective-treatment claim, a plaintiff need not demonstrate that the comparator class is identical in every respect; it need only "allege facts indicating that, 'compared with others similarly situated, [it] was selectively treated . . . based on impermissible considerations such as . . . religion, [and] intent to inhibit or punish the exercise of constitutional rights[.]'" *Barrington Cove Ltd.*, 246 F.3d at 7 (emphases omitted) (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995)). In other words, the government may not treat similarly situated persons differently when doing so burdens a fundamental right. The relevant similarity here is that both abortion clinics and licensed PRCs fall within DPH's licensing and oversight authority over reproductive healthcare facilities in Massachusetts.

As discussed *supra*, the State's public awareness campaign focused on PRCs, almost all of which, as the State pointed out, are religious in nature, App.28, 41. Neither the campaign nor the Guidance was triggered by any history of violations or legitimate public complaints. Instead, the State Defendants relied on only two complaints, both filed by their campaign partner REN during the planning. App.49–50. This selective scrutiny targeted religious activities and speech central to the mission of PRCs. App.28, 30, 31, 46–47.

By contrast, DPH received at least eight complaints against and documented multiple failed inspections of abortion clinics between 2022 and 2024. App.50. The failed health inspections included citations for outdated medications, fire hazards, deceptive advertising, negligent treatment, and staff impersonating physicians. App.50. At least three clinics committed critical violations such as using non-sterile surgical equipment, storing biohazardous material with food, failing to check patient vitals before anesthesia, and keeping unlabeled/outdated drugs. App.50. One clinic that failed its 2018 inspection has not been inspected again as of the date of the Amended Complaint—in violation of DPH's two-year inspection requirement—yet remains open. App.50. Despite these serious public-health issues, the State launched no comparable public campaign, complaint-solicitation webpage, or coordinated enforcement effort labeling abortion clinics as a "public health threat" or urging the public to avoid them. App.49–50.

The district court erred both in rejecting abortion clinics as valid comparators and in accepting the State's asserted public-health rationale rather than crediting YOM's well-pleaded allegation that the "public health threat" label was a pretext for a viewpoint-driven campaign. As the Amended Complaint details, the State Defendants lacked evidence of widespread misconduct by PRCs to such an extent that their campaign partner, Defendant REN, had to file complaints to manufacture support for the DPH Guidance and accompanying public awareness campaign.

49

App.25, 26, 47–48, 49, 50, 53. Even after an investigation cleared YOM of wrongdoing, Defendants continued publicly branding it as dangerous. App.20, 27, 37, 44–45. Meanwhile, abortion clinics with documented serious safety violations faced no comparable public condemnation or enforcement pressure. App.50–51.

Both licensed PRCs and abortion clinics operate under licenses issued and renewed by the Massachusetts Department of Public Health. App.22. Both provide medical services related to reproductive health and pregnancy. App.22. Both are subject to DPH's inspection authority and its power to investigate complaints, issue administrative guidance, and refer matters to the Attorney General. App.30. Both have been the subject of patient or advocacy-group complaints received by DPH. App.26, 50. The relevant regulatory relationship—licensed medical provider, subject to DPH oversight, operating in the reproductive healthcare space—is identical.

Indeed, contrary to the district court's opinion, the State itself juxtaposed abortion clinics with PRCs, making abortion clinics the direct comparators to PRCs in its public awareness campaign. The State's materials and press releases urged the public seeking reproductive healthcare to go to "safe" and "trusted" clinics that provide abortion care, referrals, contraception, and other similar services—while warning them to avoid PRCs as "deceptive," and "dangerous." *See*, *e.g.*, App.24–25, 28, 32–33 (DPH's "Avoid Anti-Abortion Centers" webpage and campaign

50

messaging directing patients toward abortion providers instead of PRCs). Having drawn this comparison in its own campaign messaging, the State cannot now disavow it to defeat an Equal Protection claim at the pleading stage.

The stark disparity in treatment between PRCs and abortion clinics demonstrates unconstitutional viewpoint discrimination in violation of the Equal Protection Clause. At the pleading stage, YOM need not prove that the two categories of facilities are identical in every respect. *See Barrington Cove Ltd.*, 246 F.3d at 7–10. It is sufficient that the State selectively burdened predominantly religious, pro-life actors in the reproductive-health regulatory sphere while directing the public toward secular abortion providers. At the same time, the State declined to impose comparable public condemnation or regulatory pressure on abortion facilities despite documented public-health concerns arising not from an ideologically opposed abortion advocacy group and State partner, but from the DPH's own routine inspections of those facilities. These facts support a plausible claim under the Equal Protection Clause.

In short, the district court erred by rejecting abortion clinics as valid comparators at the pleading stage and by discrediting YOM's plausible allegations of viewpoint discrimination.

**V.  The District Court Did Not Decide, and Its Caveat Does Not Defeat, YOM's State-Action Allegations Against REN and Holder**

The district court did not decide whether REN and Holder were state actors. It expressly "decline[d] to address . . . whether Defendants REN and Holder acted under color of law," having already dismissed all three counts on the merits. Add.58. Its disposition of the constitutional claims therefore decided no state-action question.

In so ruling, the court nonetheless added a "caveat." Add.58. It noted YOM's acknowledgment at the motion hearing that (1) without plausibly alleging REN and Holder acted under color of law, YOM had not stated a claim against them, and (2) that these two Defendants acted under color of law, at most, only as to the State's media campaign and not as to the exercise of any state regulatory authority. Add.58. From those concessions the court concluded that, "without state coercive authority, these particular Defendants did not (and could not) make any sort of threat to wield state authority against YOM." Add.58.

To the extent the caveat is read as resting on the premise that REN did not independently exercise the State's regulatory authority, that does not defeat YOM's state action theory. YOM's theory of liability against REN and Holder never depended on REN *itself* wielding the State's coercive regulatory power. Rather, it depends on REN's role as a willful participant in joint activity with the State in conducting the campaign.

Whether REN possessed coercive regulatory authority of its own is not the test for whether it acted under color of law. A private party is liable as a state actor when it "is a willful participant in joint activity with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27 (1980); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). In a joint-participation case, the relevant threat is the one conveyed through coordinated state action carried out by officials who indisputably possess coercive authority. The lower court's "caveat" appears to treat REN's individual lack of regulatory power as dispositive. It is not. The question is not whether REN could threaten YOM acting alone, but whether REN willfully participated with DPH—which controls YOM's license—in a campaign that conveyed the threat. Under the joint action test, private parties act under color of state law when the state "so far insinuated itself into a position of interdependence with [the private party] that it was a joint participant in [the challenged activity]." *Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412 F.3d 1, 5 (1st Cir. 2005) (quoting *Bass v. Parkwood Hosp.*, 180 F.3d 234, 242 (5th Cir. 1999)).

REN and Holder were not mere private advocates exercising their own First Amendment rights. REN participated extensively in planning and implementing the campaign, including regular coordination meetings with DPH and MORE Advertising, and was copied on internal campaign-planning and media-plan emails alongside DPH staff. App.40–44, 46, 53–57. Holder filed the October 2023

complaint against YOM while actively assisting DPH in crafting the campaign that would rely on such complaints. App.26, 44–45. Internal DPH communications indicate that REN's complaints were used to time the regulatory Guidance and the launch of the public awareness campaign. App.52.

The Commonwealth provided REN with substantial funding ($250,000 for the legal hotline and part of the $1 million public awareness campaign) and formalized it as a full-time government contractor. App.34–35, 38, 39. DPH's official "Avoid Anti-Abortion Centers" webpage links directly to REN's materials naming YOM and urging the public to avoid it. App.33–36. The Commonwealth described REN as its "trusted partner" on its website for the campaign. App.33.

A MORE Advertising employee stated that PRC logos should remain on REN's website because publishing them was "not something we can do on mass.gov." App.55. State officials thus used REN to disseminate content they could not constitutionally place on official government channels. The State may not evade constitutional limits by channeling viewpoint discrimination through a private intermediary. *Cf. Norwood v. Harrison*, 413 U.S. 455, 465 (1973). And just as in *Bantam Books, Inc.*, an entity without direct enforcement authority can still engage in unconstitutional coercion.

In short, the Amended Complaint plausibly alleges state action on the part of REN and Holder on three independent bases: joint participation with the State, a

54

close nexus and symbiotic relationship with the Commonwealth, and the State's deliberate use of REN to circumvent constitutional limits on direct government action. The district court did not decide whether REN and Holder were state actors and thus did not resolve or sufficiently analyze those theories.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the court below.

Respectfully submitted,

/s/ *Olivia F. Summers*

|  |  |
|---|---|
| SAMUEL J. WHITING | OLIVIA F. SUMMERS |
| (Bar no. 1206554) | (Bar no. 1214561) |
| MASSACHUSETTS LIBERTY | JORDAN A. SEKULOW |
| LEGAL CENTER | (Bar no. 1218870) |
| P.O. Box 2616 | STUART J. ROTH |
| Acton, MA 01720 | (Bar no. 1217356) |
| (781) 569-0400 | ANDREW J. EKONOMOU |
| sam@mafamily.org | (Bar no. 1217357) |
|  | CHRISTINA (STIERHOFF) COMPAGNONE |
|  | (Bar no. 1222867) |
|  | NATHAN J. MOELKER |
|  | (Bar no. 1214534) |
|  | AMERICAN CENTER FOR |
|  | LAW & JUSTICE |
|  | 201 Maryland Ave., NE |
|  | Washington, DC 20002 |
|  | (757) 955-8176 |
|  | osummers@aclj.org |

*Counsel for Plaintiff-Appellant*

**CERTIFICATE OF COMPLIANCE**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,917 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface and type-size requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in proportionally spaced typeface using Microsoft Word, in 14-point size.

/s/ *Olivia F. Summers*
Olivia F. Summers
  (Bar no. 1214561)
AMERICAN CENTER FOR LAW &
  JUSTICE
201 Maryland Ave., NE
Washington, DC 20002
(757) 955-8176
osummers@aclj.org

*Counsel for Plaintiff-Appellant*

# CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

/s/ *Olivia F. Summers*
Olivia F. Summers
  (Bar no. 1214561)
AMERICAN CENTER FOR LAW &
  JUSTICE
201 Maryland Ave., NE
Washington, DC 20002
(757) 955-8176
osummers@aclj.org

*Counsel for Plaintiff-Appellant*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

Order on Motions to Dismiss.................................................................. Add.1

Order Dismissing Case ..................................................................... Add.60

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| A WOMAN'S CONCERN, INC. d/b/a YOUR OPTIONS MEDICAL CENTERS, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 24-12131-LTS |
| MAURA T. HEALEY et al., | ) ) | |
| Defendants. | ) ) ) | |

ORDER ON MOTIONS TO DISMISS (DOC. NOS. 70, 72)

February 17, 2026

SOROKIN, J.

A Woman's Concern, doing business as Your Options Medical Centers ("YOM"), brings

this action for declaratory, compensatory, and injunctive relief, alleging that Governor Maura

Healey, Department of Public Health ("DPH") Commissioner Robert Goldstein, and state

"partners" Reproductive Equity Now ("REN") and its Executive Director, Rebecca Hart Holder,

engaged in a pattern of conduct to target and discriminate against YOM and other pregnancy

resource centers ("PRCs")[1] in Massachusetts.  In particular, YOM alleges that Defendants'

dissemination of various public education materials criticizing PRCs and urging compliance with

---

[1] The amended complaint and its attached exhibits use several terms to describe what the Court
reads to refer to the same type of establishment, including crisis pregnancy centers, anti-abortion
centers, and pregnancy resource centers.  See, e.g., Doc. No. 64 ¶¶ 28, 35, 60.  The Court refers
to these establishments as pregnancy resource centers or PRCs.

**Add.1**

healthcare regulations violated YOM's rights to free speech, free exercise of religion, and equal protection.  Each Defendant filed a motion to dismiss.  Doc. Nos. 70, 72.[2]

While the Court engages in a lengthy and detailed analysis of the claims advanced and the challenges to them, the issues before the Court are straightforward.  YOM concedes Defendants possess free speech rights to state their views and criticize opposing views, even with strong and scalding language.  Furthermore, YOM, a DPH-licensed clinic, does not challenge the application of state medical laws to its activities, advances no legal claim that it has been subjected to any improper scrutiny or investigation, and seeks no relief whatsoever from any present or future enforcement action.  Rather, YOM complains that the state's public education campaign condemning the practices of PRCs generally along with DPH's communications reminding all medical entities about regulatory requirements amount to unconstitutional threats to suppress YOM's speech and viewpoint.

The amended complaint fails primarily because it does not plausibly suggest that Defendants have targeted YOM for actual or threatened enforcement action, let alone to stifle its protected speech or viewpoint.  First, YOM has not plausibly alleged any unconstitutional regulatory action.  YOM takes issue with a guidance letter sent by DPH to every licensed physician, physician assistant, nurse, pharmacist, pharmacy, hospital, and clinic in Massachusetts reminding them to abide by various healthcare regulations.  This guidance highlighted several medical standards and requirements, some of which apply to YOM and some that do not.  No reasonable person reading the guidance would have believed it selectively targets YOM or other PRCs for their views.  The guidance aimed at enforcing numerous, neutral state laws, none of

---

[2] Citations to "Doc. No. __" reference items filed on the electronic docket ("ECF") in the action that is the subject of this Order; pincites are to the page numbers in the ECF header or, where applicable, to the paragraph numbering within the document.

**Add.2**

which YOM challenges.  Similarly, broad, public-facing campaign statements criticizing the practices of PRCs generally as "dangerous" "public health threats" constitute permissible government expression, not unconstitutional threats of enforcement against YOM.  YOM argues that campaign materials warning that PRCs "may use deceptive advertising" invoke threats of potential enforcement action under state medical advertising regulations.  Nonetheless, YOM has not alleged that the state has taken or threatened any such regulatory action against it.  The amended complaint also alleges no facts to suggest that state officials wielded threats of enforcement action as a mechanism to suppress YOM's speech, rather than to crack down on violations of state law.

Second, Defendants focused the campaign not on the pro-life, religious views of PRCs, but rather on the quality of their medical services and advertising practices.  None of Defendants' statements suggest any hostility to religion.  No allegations plausibly show that Defendants targeted their enforcement decisions based on the views or religion of YOM specifically or PRCs generally.  Thus, the amended complaint fails, including YOM's request for "[a] permanent injunction ordering Defendants . . . [to] ceas[e] any advertising activity or campaign that falsely accuses YOM of misconduct or of being a threat to public health."  Doc. No. 64 at 58.  For these reasons and the further reasons explained below, the Court ALLOWS Defendants' motions to dismiss.

I.   BACKGROUND

The following facts are drawn from the amended complaint and documents attached as exhibits, with all reasonable inferences drawn in favor of YOM.  YOM is a religious non-profit organization that operates licensed PRCs in Massachusetts. Doc. No. 64 ¶ 5.  YOM was founded in 1991 by three Christian families in Boston who sought to offer pregnant woman "help and support in choosing life." Id. ¶ 14.  More specifically, YOM offers those facing unexpected

**Add.3**

pregnancies free ultrasounds, counseling, and material support, such as diapers, baby clothes, and other supplies.  Id. ¶¶ 16, 19.  As a "life-affirming entity," YOM "does not perform abortions, does not refer for abortions, and does not advertise that it performs abortions."  Id. ¶ 17.  It also does not provide prenatal care.  Id. ¶ 26.  It offers information about the use of progesterone to reverse the effect of medication abortion, id. ¶ 21, but it does not allege that it prescribes or administers progesterone for these procedures or that it anticipates doing so, id. ¶ 26.  Furthermore, YOM does not allege that it performs deliveries or offers midwifery services. As a medical clinic, YOM has been licensed by DPH since 1999, id. ¶ 20, and currently operates multiple medical PRCs and a mobile medical clinic, id. ¶ 22.  Since its opening, YOM has received no patient complaints.  Id. ¶ 25.

After the Supreme Court's decision in Dobbs v. Jackson Women's Health Organization, various PRCs, including YOM, were targeted for vandalism.  Id. ¶¶ 28–32.  YOM's buildings were vandalized on June 26, 2022, July 21, 2022, and July 28, 2022.  Id. ¶¶ 30–31.  To YOM's knowledge, no one was prosecuted for this vandalism.  Id. ¶ 32.  YOM does not allege that any of the Defendants participated in these acts of vandalism, expressed approval of them, or were involved in them in any manner.  Nor does YOM allege that it reported these instances of vandalism to law enforcement authorities or Defendants.

On July 6, 2022, then-Attorney General Maura Healey issued a press release describing her simultaneously issued "consumer advisory warning patients seeking reproductive health services about the limited and potentially misleading nature of the services provided by crisis pregnancy centers."  Doc. No. 64-2 at 8.  The press release urged "patients to do their research before making an appointment to access abortion or reproductive healthcare, especially if they are seeking information about abortion care."  Id.  It further warned that, "while Crisis Pregnancy

4

**Add.4**

Centers may appear to be reproductive health care clinics, they do not provide abortion care or

abortion referrals, contraception, or other reproductive health care, despite what they may

advertise." Id.  The statement also quoted Defendant Rebecca Hart Holder, Executive Director

of REN, a reproductive justice advocacy organization, as stating, "[c]risis pregnancy centers, or

fake clinics, are dangerous facilities that use deceptive advertising to deceive pregnant people

into believing that they provide abortion care, when in reality, many do not even have doctors on

staff to discuss the full range of health care options with clients." Id.; Doc. No. 64 ¶ 37.

The statement discussed PRCs generally in this manner; nothing in the press release

directly or indirectly referred to YOM.  Indeed, a significant portion of the press release was

dedicated to warning the public about the dangers of unlicensed PRCs, as opposed to licensed

clinics like YOM.  Doc. No. 64-2 at 8 ("Most Crisis Pregnancy Centers are not licensed medical

facilities or staffed by licensed doctors or nurses.").  Notably, only four out of approximately

thirty PRCs in Massachusetts are licensed.  Doc. No. 64 ¶ 60; Doc. No. 64-8 at 12.  The press

release went on to caution that "[s]ome Crisis Pregnancy Centers offer ultrasounds performed by

unlicensed personnel," "Crisis Pregnancy Centers staffed by unlicensed personnel are not

required to keep your medical records private," and "[u]nlicensed Crisis Pregnancy Centers are

not required to follow codes of ethics or standards of care that govern healthcare professions."

Doc. No. 64-2 at 8–9.

Several months later, in March of 2023, the Massachusetts legislature passed a Fiscal

Year 2023 supplemental budget for a million-dollar "public awareness campaign to educate

providers and the public about crisis pregnancy centers and pregnancy resource centers and the

centers' lack of medical services," earmarking an additional $250,000 to fund REN's legal

hotline.  Doc. No. 64 ¶¶ 90, 109-110.  Following the passage of this budget, the Director of

5

**Add.5**

Child/Adolescent Health and Reproductive Health at DPH emailed Holder informing REN about the budget passage, explaining that DPH would be in touch about the earmark contract for REN's legal hotline, and stating, "[w]e'd be happy to talk with you about what you would like to see in the campaign." Doc. No. 64-5 at 2. On April 19, 2023, REN executed the earmark contract with the state. Doc. No. 64 ¶¶ 116–117. From August through November 2023, REN was looped in on several communications with the state and MORE Advertising—the advertising group retained by the state to run the public education campaign—about strategies for the campaign. Id. ¶¶ 122–156. For example, MORE included REN officials in an email to government officials about a kick-off meeting to launch discussions about the public education campaign. Id. ¶ 123. Furthermore, Holder was included in an email from MORE to DPH employees requesting approval for the campaign's media plan.[3] Id. ¶ 156; Doc. No. 64-7 at 43.

MORE met with state officials on multiple occasions to develop the campaign. For instance, in August 2023, MORE presented an "Environmental Scan" of anti-abortion clinics to government officials. Doc. No. 64-6 at 1. MORE's PowerPoint from this meeting identified YOM in a list of PRCs in Massachusetts. Id. at 13. Other slides noted the religious nature of PRCs, stating, "How do we want to tackle/address religious aspects of these places." Id. at 39.

---

[3] YOM characterizes this email as one in which a MORE employee "request[ed] planning and budget approval from both DPH employees and REN employees" and concludes that Holder and REN "had approval authority over government campaign budgets." Doc. No. 64 ¶ 156. This mischaracterizes what the actual email says. In the body of the email, the MORE employee requested approval from several redacted names. See Doc. No. 64-7 at 43. REN and Holder assert that the redacted names "are those of DPH employees, which DPH redacted pursuant to G.L. c. 66, § 10B." Doc. No. 83 at 2 n.2. YOM has neither disputed this explanation of the email nor offered a reasoned, non-conclusory basis to understand the redactions differently. In this light, the underlying email does not support YOM's conclusory statement that REN held approval authority over MORE's campaign-related work, nor is that a reasonable inference to draw from the record before the Court. See Clorox Co. P.R. v. Proctor & Gamble Com. Co., 228 F.3d 24, 32 (1st Cir. 2000) ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.").

**Add.6**

Another PowerPoint slide recognized that many providers worked with "patient populations with strong faith-based abortion views" who may "not resonate" with campaign materials centered on PRCs' religious ties.  Doc. No. 64-7 at 1.

As plans for the campaign took shape, on October 17, 2023, Holder submitted a letter to DPH and the state's Executive Office of Health and Human Services raising a "concern about potentially deceptive practices" by YOM and calling for an investigation into its clinics.  Doc. No. 64 ¶ 157; Doc. No. 64-2 at 16.  The letter noted that YOM advertised that its Cape Cod mobile clinic would provide "immediate" ultrasound pregnancy results.  Doc. No. 64-2 at 16–17.  The letter also derived from and cited to an article featured in the Provincetown Independent newspaper, in which YOM's director stated that "when we say immediate results, we usually mean preliminary findings," with the actual results from the ultrasound not available for another day or two.  Id.  Noting this arguable discrepancy between YOM's advertised services (immediate results) and public statements (actual results taking one-to-two days), Holder's letter alleged that YOM could be engaging in "deceptive advertising in violation of Board of Registration in Medicine and Board of Registration in Nursing regulations," or that YOM's "registered nurses could be operating outside of their scope of practice by diagnosing ultrasounds immediately."  Id. at 17.

Based on Holder's letter, DPH conducted a review of YOM's operations.  It did not require YOM to make changes to its advertising about the mobile unit or to any other advertising.  Doc. No. 64 ¶ 48.  It did, however, require YOM to eliminate language that allowed for sonographer discretion in its criteria for ultrasound exams in its Policies and Procedures

**Add.7**

Manual.[4]  Id. ¶ 49.  Once YOM made the correction, DPH issued a letter to YOM on February

29, 2024, confirming that it achieved and has maintained compliance.  Doc. No. 64-3 at 1.  That

is, DPH informed YOM that it had "corrected" "all deficiencies" found from the review.  Id.

The letter also reminded YOM that "facilities are obligated to . . . remain in compliance" and

noted that "[a]n unannounced visit may be conducted at any time at the discretion of the MA

Department of Public Health Licensure Unit."  Id.  YOM does not allege that DPH (1) lacked the

legal authority to do what it did, (2) overreached in the manner it conducted this investigation,

(3) required a correction not necessary to ensure compliance with the law, (4) misstated the facts

when the letter noted YOM was in compliance, (5) misstated the law when the letter said YOM

was obligated to remain in compliance and always faced the possibility of unannounced DPH

visits, or (6) subjected YOM to any further investigation of any sort.

The only other investigation that YOM cites is a separate review of its medical director

initiated by another entity, the Massachusetts Board of Registration in Medicine ("Board"),

which is not a party to this action.  Doc. No. 64 ¶ 52.  YOM alleges that the Board commenced

the investigation into its medical director based on the same October 2023 letter from Holder,

id., which had been submitted to multiple government entities, including the Board, Doc. No. 64-

2 at 18.  Notably, a state statute mandates that the Board "shall investigate all complaints relating

---

[4] YOM alleges that this "deficiency noted by DPH was not remotely related to the allegations contained in Defendant Holder's October 2023 complaint or to the allegations from the other Defendants that the Plaintiff as a pro-life pregnancy center is engaged in deceptive and dangerous activities."  Doc. No. 64 ¶ 51.  This is not a reasonable inference supported by the record.  Holder's October 2023 complaint cautioned that YOM could be providing out-of-scope diagnostic ultrasound services.  See Doc. No. 64-2 at 17–18 ("We have further concerns regarding Your Options Medical's claim to be able to provide appropriate and in scope diagnostic ultrasound services . . . . Out-of-scope practice is not only unlawful, but also may result in a misdiagnosis.").  These allegations in Holder's complaint are plainly related to DPH's later requirement that YOM revise language about "sonographer discretion" in its manual "concerning the criteria for ultrasound exams."  Doc. No. 64 ¶ 49.

to the proper practice of medicine" by any physician. Mass. Gen. Laws ch. 112, § 5. As part of this statutorily required investigation, the Board served two subpoenas on YOM in December 2023 and June 2024. Doc. No. 64 ¶¶ 52–53. YOM alleges that these subpoenas exceeded the scope of REN's complaint because the documents sought were not limited to the mobile unit or the dates in which the mobile unit was in service. Id. ¶¶ 54–56.

YOM complied with the first subpoena after the Board filed a request to compel compliance in Suffolk Superior Court. See Bd. of Registration in Med. v. A Woman's Concern, Inc., No. 2484CV00502 (Suffolk Super. Ct. Feb. 21, 2024). In response to the second subpoena, YOM sought a preliminary injunction in state court to prevent the Board from enforcing the subpoena; however, the state court demurred, finding that the subpoena was "neither overbroad in its request nor unduly burdensome" and that "the documents sought are relevant to the Board's investigation and do not exceed the scope of its [statutory or regulatory] authority." A Woman's Concern, Inc. v. Bd. of Registration in Med., No. 2481CV01789 (Middlesex Super. Ct. Aug. 2, 2024).[5] YOM never sought appellate review of this decision. Beyond the two subpoenas, YOM has not alleged any other regulatory actions taken by the Board (or by any other state actor) against its clinics. YOM did relay during the motion hearing, however, that the Board's investigation into its medical director was still pending as of January 29, 2026.

On January 3, 2024, DPH issued a press release entitled, "Maintaining Integrity, Accessibility, and Transparency in Reproductive Care." Doc. No. 64 ¶ 59. The press release noted that many PRCs "advertise themselves as full-service reproductive health care clinics, yet they do not provide abortion care or abortion referrals, contraception, or other important

---

[5] The Court takes judicial notice of these events. See Kowalski v. Gagne, 914 F.2d 299, 305 (1st Cir. 1990) ("It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand.").

**Add.9**

reproductive health care services." Id. The press release also stated that "[m]ost centers are affiliated with national advocacy or religious organizations that provide funding and support to advance an anti-abortion agenda." Id.

Additionally, the press release differentiated between licensed and unlicensed PRCs. Regarding the former, the press release communicated that "[l]icensed clinics must comply with the requirements and standards of medical care and services associated with this certification." Doc. No. 64-3 at 10. As for the majority of PRCs that "are not licensed as 'clinics,'" DPH noted that it "does not have jurisdiction over these facilities and cannot oversee the quality of services they provide." Id. However, DPH clarified that it still "may be involved in investigating complaints regarding allegations about provision of inappropriate medical services or staff members performing services without the required credentials." Id. at 11. The press release further stated that DPH "actively seeks feedback and complaints from individuals who have had concerning experiences with anti-abortion centers as well as from other stakeholders who have information about questionable practices." Id.

Also on January 3, 2024, Defendant Goldstein, Commissioner of DPH, issued a guidance memorandum entitled, "Reminder to Licensees Regarding Licensure Obligations and Providing Standard of Care." Doc. No. 64-3 at 13. DPH addressed the guidance to all "Massachusetts licensed physicians, physician assistants, nurses, pharmacists, pharmacies, hospitals, and clinics." Id. The stated purpose of the guidance was "to outline and remind licensees of their obligations under state law and as a condition of licensure." Id. The remainder of the six-page guidance provided a general summary of various laws governing the recipients of the letter, including reminders about the need for regulatory compliance as well as the potential

10

**Add.10**

consequences of failure to abide by the regulations.  Id. at 13–18.  The letter made no mention

whatsoever of YOM or PRCs.

Nonetheless, YOM alleges that this guidance letter was "not merely issuing generic

reminders to licensed sites/providers," but was "intended to threaten PRCs like Plaintiff YOM

and the medical providers who work with them."  Doc. No. 64 ¶ 171.  First, YOM contends that

the guidance "singled out pro-life clinics and their practices" by "expressly criticiz[ing] the

prescription of progesterone for the purposes of counteracting the abortion pill."  Id. ¶ 67.  On

this topic, the guidance stated:

> Physicians and Advanced Practice Registered Nurses (APRN) who practice in
> violation of good and accepted health care practice may be disciplined for conduct
> which places into question their competence to practice. For example, there is
> strong evidence that medication abortion reversal is unproven, unethical, and
> unsafe to provide to patients; such that a physician or APRN who offers or provides
> this treatment could be found to be practicing inconsistently with accepted practice
> and subject to discipline.

Doc. No. 64-3 at 15.  YOM makes no allegation that it prescribes progesterone specifically,

offers abortion reversals to patients generally, or intends to offer any of these treatments in the

future.

Second, YOM notes that the file name for this guidance was "Guidance on Anti-abortion

center and standard of care reminder guidance – 1.3.2024."  Doc. No. 64 ¶ 64.  In internal emails

about drafting the guidance, DPH stated that, "[w]hile [the linked document] does not

specifically refer to anti-abortion centers (as the requirements outlined therein would apply to

any licensed site/provider), the examples used in the document do put anti-abortion centers on

notice."  Id. ¶ 170.  Based on these details, YOM asserts that "Defendant Goldstein issued this

statement to threaten pro-life clinics and their doctors in line with the actions that have already

been taken against YOM and its medical director."  Id. ¶ 70.

11

**Add.11**

Throughout the next several months, DPH and REN "went back and forth in many detailed communications" in preparation to launch the public education campaign.  Id. ¶ 206.  For example, on January 9, 2024, a REN employee sent an email to a state government employee attaching REN's PowerPoint slides from a meeting centered on planning and coordinating details of the campaign.  Id. ¶¶ 207–211.  The presentation indicated that REN would draft materials for the campaign, including a media advisory and op-ed, which would be sent to DPH for approval.  Id. ¶ 210.  Furthermore, on February 21, 2024, employees of REN, DPH, and MORE exchanged emails about plans to publish government factsheets linking directly to REN's webpages about PRCs.  Id. ¶ 216.  In the same email chain, a MORE employee noted that it would be beneficial for REN's website to keep publishing logos of PRCs and that this was "not something we can do on mass.gov."  Id. ¶¶ 218–229; Doc. No. 64-12 at 4.  And throughout May and June 2024, employees from DPH, MORE, and REN continued to exchange various other emails discussing plans for campaign materials, events, and initiatives.  Doc. No. 64 ¶¶ 222–232.

On June 10, 2024, the Healey administration launched a "first-in-the-nation" campaign against PRCs, implementing the state legislature's prior funding for the campaign.[6]  Id. ¶ 74.  According to the administration's press release, the campaign was intended to protect "patients from the deceptive and dangerous tactics that anti-abortion centers often use to stop people from accessing comprehensive reproductive services."  Id. ¶ 77.  A news article quoted Defendant Goldstein stating:

---

[6] At one point in the amended complaint, YOM asserts that by "funding a statewide campaign against [YOM's] viewpoint, . . . Defendants have created a comprehensive scheme of viewpoint discrimination."  Doc. No. 64 ¶ 241.  This assertion confuses the fact that the state legislature, not Defendants, required and funded the campaign.  To the extent YOM makes this point to argue that neither the state government generally nor these public officials specifically may take a position on matters concerning medical care or abortion, the Court addresses that argument below.

**Add.12**

[The campaign] counter-punches to the vast amount of misinformation and disinformation that these centers peddle every day, deceiving people who may be frightened or confused . . . .  As the commissioner of public health, I'm resolute about calling out this deception for what it is: a public health threat.  When people are denied factual information and the freedom to make fully informed decisions about their reproductive health, it can lead to worse mental and physical outcomes.

Id. ¶ 80.

The campaign has resulted in the distribution of various public-facing materials about PRCs.  YOM alleges that "[s]ince the government launched its campaign, billboards, posters, and ads are now present throughout Massachusetts."  Id. ¶ 82.  For example, on DPH's website is a page called "Avoid Anti-Abortion Centers," which solicits complaints from those who have experienced harm from a PRC.  Id. ¶¶ 83–84.  The DPH webpage links to several others, including a page on REN's website entitled, "What Are Anti-Abortion Centers?"  Id. ¶¶ 85–89.  That webpage describes PRCs as "facilities that present themselves as resources for people facing unplanned pregnancies, but in reality, exist to dissuade people from accessing abortion care."  Doc. No. 64-3 at 30.  The page provides a list of PRCs in New England, including YOM.  Id.; Doc. No. 64 ¶¶ 91–92.

REN has also published a guidebook on its website, which again lists all the PRCs in New England, including YOM's centers.  Doc. No. 64 ¶¶ 93–94.  The guidebook states that PRCs "pose a serious threat to unbiased reproductive health care here in New England," "use deceptive practices to attract patients," and "often use disinformation as a way to dissuade people from accessing abortion care."  Id. ¶¶ 95–96.  It also provides the phone number of REN's free and confidential legal hotline where people can report their cases and receive referrals to pro bono attorneys.  Id. ¶ 99.  The guidebook further outlines how patients might file a report against a PRC with the Attorney General's Office.  Id. ¶ 102.

**Add.13**

According to YOM, all these campaign initiatives and materials singled out YOM and other PRCs as a danger to public health, even though "zero patient complaints have ever been lodged with Defendants against YOM." Id. ¶ 331.  YOM alleges that, "despite the Defendants' million-dollar effort to solicit complaints from the public, a public records request revealed that no complaints were filed with the Attorney General's Office within the first seven months of the public campaign, and no indication of any being filed since that records request." Id. ¶ 205. YOM also notes that a public-records request to DPH asking for all complaints filed against PRCs between June 19, 2022, and June 20, 2024, produced only two complaints, both of which were submitted by REN, "not by women claiming to be victims of misconduct by [PRCs]." [7] Id. ¶ 184.  While this assertion is correct in a literal sense, it is not fully accurate.  REN's second complaint brought to DPH's attention a class-action lawsuit brought by a patient who sought pregnancy testing from a PRC called Clearway Clinic.  Doc. No. 64-8 at 13.  Her lawsuit alleged that Clearway Clinic engaged in deceptive advertising and harmful medical practices that ultimately put her health at risk and required her to receive emergency surgery.  Id. at 14.  Citing the lawsuit, REN wrote that its "allegations . . . create a basis for an investigation as to whether

---

[7] YOM additionally asserts that state officials used REN's two complaints as "pretext" for launching the entire campaign, pointing to an internal email from a DPH official to a REN employee that stated, "[w]e were using the [two REN] complaints as a reason to put out [the January 3, 2023 guidance] now rather than March, when the health marketing campaign launches." Doc. No. 64 ¶ 199; Doc. No. 64-11 at 11.  But in the remainder of the email thread, which YOM attached as an exhibit to the amended complaint, the DPH official qualified this statement by noting that DPH's "effort to ensure that these centers were operating appropriately has been a priority for this administration (and DPH) even before the complaints were filed." Doc. No. 64-11 at 11.  The email continues: "The complaints certainly shine a much-needed light on some questionable operations . . . but it is the overarching commitment to high-quality reproductive care and the deep concerns about these centers that are driving this effort." Id. at 11–12.  In any event, the campaign arose from a budget enacted by the legislature directing the campaign to occur; the legislature passed this budget in March 2023, well before the filing of either of REN's complaints.

**Add.14**

Clearway endorses out-of-scope practices at its clinics and has engaged in deceptive and false advertising." Id. at 15.  Thus, this complaint by REN arose from an aggrieved patient's alleged experiences at a PRC, even if the patient did not directly bring her concerns to DPH.

YOM contends that "[s]imilarly situated entities that do not share the same viewpoint as YOM, that is, abortion providers, do not receive the same scrutiny from Defendants."  Doc. No. 64 ¶ 333.  For this point, YOM notes that a public-records request for complaints to DPH against abortion clinics revealed that DPH received at least eight such complaints between 2022 and 2024.  Id. ¶ 188.  However, YOM does not allege that DPH ignored these complaints against abortion providers or handled the complaints differently than complaints against PRCs.  YOM also mentions that three abortion clinics have previously failed their DPH inspections, id. ¶ 190, and that one abortion clinic has not been subjected to DPH's required two-year inspections that PRCs have had to undergo, id. ¶ 191.  Based on these facts, YOM asserts that DPH has imposed a "double standard for pro-life centers" "based on the religiously based pro-life viewpoint of these centers, not on any true concern for public health."  Id. ¶ 193.  YOM alleges that the government's actions "have had immediate and devastating effects on [its] operations and constitutional rights," including causing a doctor to resign and deterring patients from seeking its services.[8]  Id. ¶ 240.

YOM initially filed this suit on August 19, 2024.  Doc. No. 1.  All Defendants moved to dismiss the complaint.  Doc. Nos. 33, 43.  After seeking leave to do so, the American Civil Liberties Union of Massachusetts ("ACLU of Massachusetts") filed an amicus brief on January

---

[8] While YOM asserts that this doctor quit "[a]s a direct, immediate, and foreseeable result of Defendants' threats," Doc. No. 64 ¶ 274, it fails to provide any non-conclusory allegations indicating that the doctor's decision to resign from YOM was driven by Defendants' actions. YOM advances no factual allegations regarding this doctor's departure, just legal conclusions.

**Add.15**

24, 2025.[9]  Doc. No. 53.  No party opposed the ACLU of Massachusetts's request to file the amicus brief or the brief itself.  The Court held a hearing on the motions to dismiss on May 8, 2025, during which YOM requested leave to amend its complaint in light of recently obtained public records.  The Court allowed the request, Doc. No. 60, and terminated as moot the motions then pending.  YOM filed the amended complaint on June 20, 2025.  Doc. No. 64.  The amended complaint advances three counts against all Defendants: Count I alleges a violation of the Free Speech Clause of the First Amendment; Count II alleges a violation of the Free Exercise Clause of the First Amendment; and Count III alleges a violation of the Equal Protection Clause of the Fourteenth Amendment.  Defendants Goldstein and Healey ("State Defendants") moved to dismiss all three counts on July 25, 2025.  Doc. No. 70.  On the same day, Defendants Holder and REN moved to dismiss all counts as well.  Doc. No. 72.  YOM opposed both motions.  Doc. Nos. 80, 81.  The movants each filed a reply.  Doc. Nos. 82, 83.  The Court held a hearing on the motions on January 29, 2026.

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  The Court need not, however, "accept the complaint's legal conclusions or naked assertions devoid of further factual enhancement."  Soto-Torres v. Fraticelli, 654 F.3d 153, 156 (1st Cir. 2011) (citation modified).

---

[9] The Court considers "the amicus brief[] only insofar as [it] concern[s] legal issues and positions raised by the parties."  New Jersey v. Trump, 131 F.4th 27, 32 n.1 (1st Cir. 2025)

**Add.16**

"Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001). However, "[w]hen the complaint relies upon a document, whose authenticity is not challenged, such a document merges into the pleadings and the court may properly consider it under a Rule 12(b)(6) motion to dismiss." Id. (citation modified). The amended complaint attaches various documents, all of which are referenced in the body of the pleading. Thus, the Court considers these documents as well.

III.    DISCUSSION

"Abortion presents a profound moral issue on which Americans hold sharply conflicting views." Dobbs v. Jackson Women's Health Org., 597 U.S. 215, 223 (2022). While the parties themselves have differing views on abortion, this case is not about the legality or morality of abortion. Indeed, there are a number of notable matters that this case does not concern.

"This case is not about whether state officials can express opinions[,]" as YOM concedes. Doc. No. 80 at 11. The Supreme Court has made clear that "[a] government official can share her views freely and criticize particular beliefs, and she can do so forcefully in her hopes of persuading others to follow her lead." Nat'l Rifle Ass'n of Am. v. Vullo, 602 U.S. 175, 188 (2024). "It is the very business of government to favor and disfavor points of view." Nat'l Endowment for Arts v. Finley, 524 U.S. 569, 598 (1998) (Scalia, J., concurring). State officials can publicly express their views on contentious issues of public concern. Indeed, officials regularly express their views in vivid and powerful language on deeply divisive issues including, for example, what, if any, immigration the United States should permit and how it should enforce the immigration laws. These topics, of course, are not off-limits merely because some people's views about them are religiously motivated or derived from religious beliefs. Compare Camillo

17

**Add.17**

Barone, <u>Bishops condemn Trump's immigration orders for stoking fear, anxiety</u>, Nat'l Cath. Rep., Jan. 23, 2025, https://www.ncronline.org/news/bishops-condemn-trumps-immigration-orders-stoking-fear-anxiety [https://perma.cc/X2DM-BMXF] (quoting bishops' statement that President Trump's "dehumanizing executive orders contradict our core values of compassion, justice and the biblical mandate to welcome the stranger"), <u>with</u> Cara Tabachnick, <u>Vice President JD Vance blasts U.S. Catholic bishops condemning ICE entering churches and schools</u>, CBS News, Jan. 26, 2025, https://www.cbsnews.com/news/jd-vance-interview-face-the-nation-catholic-bishops-ice-order/ [https://perma.cc/784T-EKVZ] (quoting Vice President Vance criticizing Catholic bishops for not being "good partner[s] in common sense immigration enforcement").  These well-established principles are not disputed in this case.  YOM agrees, as it must, that government officials have the right to voice their own views, to criticize opposing views, and to do so with "aggressive" and "scalding" language.  Doc. No. 65 at 34:5–21, 56:9–21.

Nor is this case about whether YOM, a licensed medical provider, is exempt from the general regulations and laws governing all medical licensees in Massachusetts.  YOM makes no such claim here.[10]  YOM does not argue that its religious status or the religiously motivated nature of its activity places it outside the licensure obligations imposed by the state.  YOM also does not contend that any of the underlying state laws, rules, or regulations governing its medical license are unconstitutional per se or as applied.  YOM concedes that it must comply with all

---

[10] Whether or how the First Amendment imposes any limits on the general application of otherwise neutral laws to religious activity, religiously motivated activity, or activity constituting an expression of religious belief raises issues of ongoing debate in the Supreme Court.  <u>See generally</u> <u>Fulton v. City of Philadelphia</u>, 593 U.S. 522 (2021).

**Add.18**

requirements that apply to all licensed medical clinics.  Indeed, the amended complaint seeks no relief from the enforcement of those rules against YOM.  Doc. No. 64 at 58.

Moreover, this case is not about the rights of all PRCs.  YOM does not bring this lawsuit as a class action on behalf of all PRCs in Massachusetts.  It asserts no claim on behalf of any other entity or person.  This is an individual case about whether Defendants' actions violate YOM's constitutional rights.  The Court considers allegations regarding other PRCs only to the extent they bear on YOM's particular claims on its own behalf in this case.

Having made clear what this case is not about, the Court turns to the dispute at hand.  This case is about whether Massachusetts government officials wielded the power of the state to unconstitutionally threaten and violate the rights of YOM.  The Court now considers that question, taking each of YOM's three causes of action in turn.

A.    Count I: Free Speech Claim

The Court begins with State Defendants' assertion that YOM fails to state a violation of the Free Speech Clause.  In considering this challenge, the Court considers not only the alleged actions of State Defendants, but also—assuming, without deciding, that REN and Holder acted as state actors—the alleged actions of REN and Holder.  It does so to consider the amended complaint in the light most favorable to YOM.

To plead a § 1983 claim, a plaintiff must allege that a person, acting under the color of law, deprived the plaintiff of a constitutionally protected right.  42 U.S.C. § 1983.  The First Amendment safeguards the right to free speech and binds states by way of incorporation through the Fourteenth Amendment.  See Locke v. Davey, 540 U.S. 712, 718 (2004).  The Free Speech Clause prohibits government entities and actors from "abridging the freedom of speech."  U.S. Const. amend. I.

19

**Add.19**

Nonetheless, the Free Speech Clause "has no application" when government officials are engaging in their own expressive conduct. Pleasant Grove City v. Summum, 555 U. S. 460, 467 (2009). As mentioned above, "[t]he government can say what it wishes and select the views that it wants to express." Vullo, 602 U.S. at 187 (citation modified). Indeed, "[i]t is inevitable that [the] government will adopt and pursue programs and policies within its constitutional powers but which nevertheless are contrary to the profound beliefs and sincere convictions of some of its citizens." Bd. of Regents of Univ. of Wis. Sys. v. Southworth, 529 U.S. 217, 229 (2000); see Vullo, 602 U.S. at 187 (citation modified) ("When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others, and thus does not need to maintain viewpoint-neutrality when its officers and employees speak about that venture."). The government needs this ability in order to function. "If every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed." Keller v. State Bar of Cal., 496 U.S. 1, 12–13 (1990).

Of course, this does not mean there are no restraints on speech by government entities and actors. "While a government official can share her views freely and criticize particular beliefs in the hopes of persuading others, she may not use the power of the office to punish or suppress disfavored expression." Vullo, 602 U.S. at 176. This distinction is at the root of YOM's free speech claim. YOM argues that "Defendants crossed the constitutional line from legitimate policy expression into unconstitutional chilling of speech by branding PRCs as 'public health threats,' actively soliciting complaints against them, threatening regulatory consequences,

**Add.20**

and orchestrating a public intimidation campaign that has already chilled YOM's protected speech."  Doc. No. 80 at 12.

Two Supreme Court cases cited by the parties help clarify the line between permissive and unconstitutional government expression.  In Bantam Books, Inc. v. Sullivan, the "Rhode Island Commission to Engage Morality in Youth" used its governmental powers to threaten legal sanctions against those who distributed publications it listed as "objectionable."  372 U.S. 58, 66–67 (1963).  Specifically, the commission sent multiple notices to a book distributor thanking him in advance for his cooperation with the commission, reminding him of the commission's duty to recommend to the Attorney General prosecution of purveyors of obscenity, and informing him that the list of objectionable publications was circulated to local police departments.  Id. at 61–63.  Indeed, a local police officer usually visited the distributor shortly after the notices were received to confirm the actions he had taken regarding the disfavored publications.  Id. at 63.  The Supreme Court held that the commission's "system of informal censorship" was unconstitutional because the commission's coercive process to weed out "objectionable" materials "provide[d] no safeguards whatever against the suppression of nonobscene, and therefore constitutionally protected, matter."  Id. at 70–72.

National Rifle Association of America v. Vullo is another case that illustrates when government communications transcend into suppression.  There, the plaintiff alleged that the superintendent of New York's Department of Financial Services, who held direct regulatory and enforcement authority over all insurance companies, told insurance executives in a private meeting that she would be "less interested" in pursuing insurance law infractions "so long as [the company] ceased providing insurance to [pro-]gun groups, especially the NRA."  602 U.S. 175, 192 (2024).  She proceeded to tell the executives that her department would "focus its

**Add.21**

forthcoming affinity-insurance enforcement action solely on those syndicates which served the NRA and ignore other syndicates writing similar policies." Id. at 183. Her actions singling out the NRA did not stop there. She also promulgated guidance letters and a press release urging insurance companies and banks to review and discontinue their relationships with the NRA. Id. at 183–85. Upon weighing these facts, the Court held that the NRA had plausibly alleged that the superintendent violated its First Amendment rights by "threaten[ing] to wield her power against those refusing to aid her campaign to punish the NRA's gun-promotion advocacy." Id. at 194. The Court explained that, "although [the state] can pursue violations of state insurance law, [it] cannot do so in order to punish or suppress the [plaintiff's] protected expression." Id. at 196.

Relying on Bantam Books and Vullo, YOM alleges that Defendants levied "viewpoint-discriminatory implicit threats" through their public education campaign materials and various other communications. Doc. No. 64 ¶¶ 250, 254. YOM's analogy to these cases fails. The amended complaint includes no mention of any direct, express threats made against YOM by Defendants. Cf. Vullo, 602 U.S. at 192 (complaint alleged that regulator directly threatened regulated entities that "she would 'focus' her enforcement actions 'solely' on the syndicates with ties to the NRA"). There is no allegation that any of the Defendants told YOM or other PRCs that they cannot engage in certain kinds of speech or views. Cf. Bantam Books, 372 U.S. at 61 (commission sent notice listing "objectionable" books that could not be sold). Nor is there any allegation that Defendants told YOM it could avoid enforcement action by abandoning its anti-abortion viewpoint. Moreover, YOM does not allege that Defendants threatened third parties with punishment if those parties worked or affiliated with YOM. Simply put, this case is not like Bantam Books or Vullo. There is no direct effort to suppress speech. Of course, there is criticism of the approach taken by PRCs—but that speech is permissible, as YOM concedes.

22

**Add.22**

Without allegations of any express, coercive threats made by Defendants, the remaining question is whether the factual allegations plausibly support an inference of an implied threat to use the power of the state to suppress YOM's free speech. YOM references various statements by Defendants. The Court first addresses each challenged statement individually and then evaluates the statements together considering the totality of the circumstances.

### 1. *DPH's January 2024 Guidance*

The first challenged statement is the guidance memorandum issued by DPH on January 3, 2024, entitled, "Reminder to Licensees Regarding Licensure Obligations and Providing Standard of Care." Doc. No. 64-3 at 13–18. Addressed to "Massachusetts licensed physicians, physician assistants, nurses, pharmacists, pharmacies, hospitals, and clinics," the guidance provided various reminders about licensure requirements and standards. Id. at 13. YOM argues that DPH "issued this statement to threaten pro-life clinics and their doctors." Doc. No. 64 ¶ 70. The content of the guidance, however, does not support YOM's assertion.

First, the guidance did not mention or refer to YOM or PRCs at all. Rather, much of the six-page document was dedicated to stating reminders about state regulations and laws that apply to all licensees. For example, "any clinic providing medical services must meet the requirements of 105 CMR 140.000, including specific requirements related to staffing." Doc. No. 64-3 at 14. The guidance also reminded practitioners that they "are subject to professional discipline for the failure to comply with recognized standards of practice and for engaging in conduct that is dishonest or deceitful." Id. It reminded physician assistants ("PAs") and nurses that they must act within their scope of practice. Id. at 14–15. Additionally, the guidance noted that physicians may not aid or abet an unlicensed person to perform activities requiring a license. Id. at 17. All these reminders summarize generic licensure requirements that bind all licensed entities, regardless of the types of services they provide or the viewpoints they hold.

**Add.23**

The guidance also stated that DPH "takes patients' rights and the provision of high quality, evidence-based, safe care by all providers seriously. **This includes providing patients accurate and complete information for informed decisionmaking, accurate portrayal and advertising of clinical services, and licensees practicing within their scope of practice and their license**."[11] Id. at 13.  This is a generally applicable statement of DPH's regulatory priorities.  YOM does not allege that DPH's emphasis on "providing patients accurate and complete information" interferes with its ability to express its pro-life beliefs or to provide services in line with such beliefs.  YOM also does not allege that its clinics are unable to provide "accurate and complete information" to pregnant patients because of its religious viewpoint.[12] Furthermore, there are no factual allegations that DPH has threatened disciplinary action against any PRCs for failing to provide "accurate and complete information."  This language in the guidance reflects a general expression of regulatory objectives applicable to virtually all licensees, and YOM has not argued, let alone plausibly alleged, otherwise.

Second, the guidance stated specific regulatory reminders with no connection to YOM's work at all.  For example, the guidance noted that "[a]ll practitioners and entities must comply with controlled substance requirements in M.G.L. c. 94C."  Id. at 14.  Nothing in the complaint suggests that YOM dispenses or prescribes controlled substances.  Of course, many other licensees (doctors, pharmacists, hospitals, and clinics) do dispense or prescribe controlled substances.  This directive speaks to those persons and entities, but not to YOM.  The guidance also explained that state regulations "prohibit nurses and PAs from exercising undue influence

---

[11] The Court reproduces bolded language as it appears in the original source.

[12] In fact, YOM represents that it can provide full and complete information to patients.  Its website states: "We provide information on abortion side effects, what to expect, and more so you can make a fully informed choice."  Doc. No. 64-2 at 6 (emphasis added).

24

**Add.24**

on a patient, including the promotion or sale of services, goods, appliances, or drugs, in such a manner as to exploit the patient for financial gain." Id. at 16. This reminder, too, is inapplicable to YOM, which is a not-for-profit organization that provides all its services free of charge. Doc. No. 64 ¶ 19. The guidance also stated that advanced practice registered nurses ("APRNs") "who provide abortion services must comply with Advisory Ruling 21-02." Doc. No. 64-3 at 17. This requirement does not apply to PRCs, which do not provide abortion services. That the guidance included regulatory reminders directed only at abortion providers undermines YOM's assertion that the guidance was aimed at suppressing PRCs' anti-abortion viewpoint.

Third, even provisions of the guidance that bear a closer link to YOM's services have general applicability to licensed entities beyond YOM and other PRCs. For example, the guidance stated that a nurse can provide ultrasounds "only after appropriate education and demonstrated clinical competency." Id. at 14. It also noted that the state had previously imposed "discipline on a physician who authored ultrasound reports on the basis of sonographer impressions in lieu of personally reviewing images." Id. at 17. These statements apply to YOM, which provides ultrasounds.[13] Doc. No. 64 ¶ 16. But they are not solely targeted at YOM and other PRCs. They plainly govern any licensed entity that offers ultrasound services, including abortion providers as well as entities that use ultrasounds for non-pregnancy-related care, such as for diagnosing blood clots or detecting cysts. The guidance also mentioned that any entity that offers ambulatory medical services—which "include procedures such as diagnosing pregnancies, performing ultrasounds and other clinical procedurals"—"**is subject to clinic licensure and must meet the requirements of 105 CMR 140.000,** unless otherwise exempt." Doc. No. 64-3

---

[13] Nothing in the amended complaint suggests that the doctor referenced in the guidance letter worked for YOM (or any other PRC), nor does YOM advance such an argument.

**Add.25**

at 13.  While this statement applies to YOM in a peripheral sense because it is a licensed entity that offers pregnancy diagnoses and ultrasounds, the statement does not contain any semblance of a targeted threat toward YOM.  YOM is and has been licensed at all relevant times.  This statement merely reminded clinics to comply with a regulation setting forth standards for the maintenance of licensed clinics.  Unlicensed PRCs—which are not among the recipients of this guidance precisely because they are unlicensed—may have properly viewed this statement as a warning that operating without a license while offering medical services requiring a license could result in regulatory action.  But, of course, that is a permissible and proper warning to those violating state law.

Put simply, the guidance summarized various rules and requirements for state licensure, only some of which apply to YOM.  These neutral descriptions of the standards governing licensed medical providers simply conveyed statements of Massachusetts law, not threats.  VDARE Found. v. City of Colo. Springs, 11 F.4th 1151, 1165 (10th Cir. 2021) (noting that government's "statement of [state] law" "contains no plausible threat"); Bantam Books, 372 U.S. at 72 (noting that "advising [regulated entities] of their legal . . .  liabilities" is not a First Amendment violation).  YOM does not contend that the guidance misstated any licensure requirements under state laws and regulations.  It also does not challenge the legitimacy or importance of any of the underlying medical regulations, laws, or requirements communicated in the guidance.  It does not argue these laws and rules do not apply to YOM or challenge the words or tone used in the letter.  Nor does YOM seek any relief whatsoever preventing the state from applying the governing rules to it in the future.  Doc. No. 64 at 58.

YOM does raise one substantive, medical dispute with the guidance—namely, its criticism of medication abortion reversals.  That portion of the guidance stated, "there is strong

evidence that medication abortion reversal is unproven, unethical, and unsafe to provide to patients; such that a physician or APRN who offers or provides this treatment could be found to be practicing inconsistently with accepted practice and subject to discipline." Doc. No. 64-3 at 15. This sentence was coupled with a corresponding footnote citing to the "American College of Obstetricians and Gynecologists advocacy stance regarding medication abortion 'reversals.'" Id. at 15 n.7. Based on this language, YOM claims the guidance "threatens physicians with discipline and penalties for the prescription of progesterone, even though progesterone is frequently used to support pregnancies, particularly at-risk pregnancies . . . and is perfectly lawful as a prescription medication in Massachusetts." Doc. No. 64 ¶ 68.

The amended complaint does not establish that YOM has standing to challenge this statement. YOM does not allege that its centers offer—or are even contemplating offering—medication abortion reversals, rendering it implausible that this guidance poses a threat to its operations or First Amendment rights. YOM merely alleges that it provides information about medication abortion reversals—an expressive activity that is not targeted, addressed, or suppressed by the guidance. Doc. No. 64 ¶ 21. Nothing in the guidance placed limits on discussing progesterone (or anything else) with patients. In fact, YOM's website, to this day, continues to publicly provide information about medication abortion reversals. See What is Abortion Pill Reversal?, Your Options Medical (Mar. 16, 2020), https://www.youroptionsma.org/post/what-is-abortion-pill-reversal [https://perma.cc/K5SX-RTVW]. And, there is no indication that the state has taken or threatened action to prevent YOM

**Add.27**

or other entities from conveying this type of information.[14]  All of these circumstances directly undermine YOM's claim that the guidance's discussion on medication abortion reversals impermissibly suppresses or chills its protected speech.

In any event, YOM mischaracterizes the guidance, which discouraged the use of progesterone in just one context—reversing medication abortions.  The guidance did not threaten regulatory action against doctors who prescribe progesterone in other ways.  Furthermore, the guidance's characterization of medication abortion reversal as "unproven, unethical, and unsafe" reflects a proper exercise of DPH's discretion to determine medical standards for the state.  See Simopoulos v. Virginia, 462 U.S. 506, 516 (1983) ("In view of its interests in protecting the health of its citizens, the State necessarily has considerable discretion in determining standards for the licensing of medical facilities."); United States v. Skrmetti, 605 U.S. 495, 524 (2025) (quoting Gonzales v. Carhart, 550 U.S. 124, 163 (2007)) ("We afford States 'wide discretion to pass legislation in areas where there is medical and scientific uncertainty.'").  Whether DPH is correct that medication abortion reversal is "unproven, unethical and unsafe" is a matter for litigation by an entity or person that has faced (or faces impending) discipline for prescribing

---

[14] Thus, this situation is not comparable to National Institute of Family & Life Advocates v. James, 160 F.4th 360 (2d Cir. 2025), a recent Second Circuit case mentioned in YOM's notice of supplemental authority.  Doc. No. 86.  There, the New York Attorney General took civil enforcement action against pro-life, non-profit organizations for making informational statements regarding abortion pill reversals.  James, 160 F.4th at 365.  YOM does not plausibly allege that type of activity.  YOM does allege that the guidance "called out specific acts of medical sites and providers, like YOM, such as providing even mere information about the use of progesterone as a potential aid for reversing a medication abortion."  Doc. No. 64 ¶ 71.  The Court need not and does not accept this allegation because it is contradicted by the plain text of the guidance, which says no such thing.  See Clorox, 228 F.3d at 32.  It speaks only to providing medication abortion reversals and says nothing about providing information about such treatments.  Plainly, YOM can discuss such a use, and nothing in the guidance (or elsewhere) plausibly suggests otherwise.

**Add.28**

progesterone for the purpose of abortion reversals, or perhaps one that wishes to do so but fears DPH sanction.  YOM is not such an entity based on its own allegations.

Accordingly, DPH's guidance cannot be "reasonably understood" to convey an express or implicit threat to punish YOM's free speech.  Vullo, 602 U.S. at 177 (noting that plaintiff must allege that challenged communications are "reasonably understood" as threats).  To the extent the guidance reminded licensees that they could face discipline for failing to comply with licensure requirements, reminding regulated entities about their obligations under the law—and the potential adverse consequences they may face should they fail to follow the law—is a normal and necessary government function.  Id. at 201 (Jackson, J., concurring) ("[O]ur democracy can function only if the government can effectively enforce the rules embodied in legislation; by its nature, such enforcement often involves coercion in the form of legal sanctions.").  Importantly, the guidance did not link potential disciplinary action to any particular viewpoint or speech.  The guidance did not state or suggest that licensed providers would be freed from enforcement oversight if they were to disassociate from anti-abortion viewpoints.  This situation is a far cry from Bantam Books and Vullo, where the state brandished potential enforcement action in order to suppress disfavored speech.  Instead, DPH simply conveyed that licensed entities, including YOM, must comply with the regulatory mandates imposed on all licensees, or else risk facing enforcement action.  Such communications did not, as YOM alleges, "warn[] pro-life doctors, nurses, and other healthcare providers that their licenses would be in jeopardy if they worked with PRCs."  Doc. No. 64 ¶ 280.

YOM raises one additional issue with the guidance.  YOM notes that the internal file name of the statement was entitled, "Guidance on Anti-abortion center and standard of care reminder guidance – 1.3.2024."  Id. ¶ 64.  Furthermore, YOM points to an internal DPH email

29

**Add.29**

linking to a draft of the guidance and stating,"[w]hile [the linked document] does not specifically refer to anti-abortion centers (as the requirements outlined therein would apply to any licensed site/provider), the examples used in the document do put anti-abortion centers on notice." Id. ¶ 170.  According to YOM, these details reveal that Goldstein "issued the statement to threaten pro-life clinics and their doctors." Id. ¶ 70.  But these internal details about the guidance, which YOM presumably obtained through a public-records request, do not alter how the guidance was received and understood by its recipients.[15]  Drawing all the inferences in favor of YOM, these facts support the inference that at least one of DPH's purposes for drafting and issuing the guidance was to remind anti-abortion centers about standard-of-care requirements.  But internal considerations of government officials that were never communicated externally do not turn an objectively non-threatening communication into a threat.  Nor does the file name of the guidance—known only by its drafters—impact its message or how it was perceived by YOM and other recipients.  As discussed above, the guidance cannot be plausibly understood as a threat.  These communications reminded YOM and other healthcare entities to abide by their existing

---

[15] Indeed, during the motion hearing, counsel for YOM noted that the intent of the government speaker does not factor into the Vullo analysis because it is the reasonable perception of the regulated entity that matters for determining whether government speech amounts to a coercive threat.

**Add.30**

obligations under the law and professional standards.  In light of these considerations, YOM has

not plausibly shown that the guidance amounts to an unconstitutional show of coercive power.[16]

2.    *DPH's January 2024 Press Release*

Next, YOM challenges the other statement issued by DPH on January 3, 2024: the press

release entitled, "Maintaining Integrity, Accessibility, and Transparency in Reproductive Care."

Doc. No. 64-3 at 10–12.  That press release stated:

> In the wake of recent complaints regarding several anti-abortion centers, DPH has
> initiated a review of its statutory and regulatory obligations.  The purpose of this
> review is to make sure DPH professional licensees and facility licensees – including
> these centers – are adhering to their designated scope of practice and operating
> transparently and free from deceptive practices.

Id. at 10.  It proceeded to warn that many PRCs "advertise themselves as full-service

reproductive health care clinics, yet they do not provide abortion care or abortion referrals,

contraception, or other important reproductive health care services."  Id.  The release further

explained that "there are nearly [thirty] anti-abortion centers that operate in the state, with only

---

[16] Even if the file name along with DPH's internal emails about putting "anti-abortion centers on notice" plausibly support the conclusion that Defendants created the guidance because of PRCs, that at most supports the conclusion that DPH officials were (rightly or wrongly) concerned that some PRCs operated improperly without a license, that some PRCs improperly prescribed progesterone for medication abortion reversals, and that some persons reading ultrasounds at PRCs did so beyond the scope of their training and authority.  In acting on these concerns, DPH sent a general letter not targeted at PRCs, but rather to all licensees with reminders about these and other compliance concerns.  YOM does not state a claim that Defendants in so doing impermissibly violated YOM's right to be free of government suppression of its views.  Indeed, Vullo itself illustrates the point.  There, the superintendent levied threats of selective enforcement at a private meeting after discovering that an insurance policy issued to the NRA had technical infractions in violation of New York insurance law.  Had the superintendent instead warned all insurance companies that any policy (without regard to whom it was issued) with those infractions violated the law and exposed the insurer to regulatory sanction, the NRA would have had no case (assuming the superintendent did not then selectively threaten or investigate the insurers based upon the views of their clients).  Here, DPH warned all licensees generally and has not investigated or threatened them selectively, as discussed infra.

**Add.31**

four currently subject to DPH licensure under state law." Id.  Regarding unlicensed PRCs

specifically, the press release elaborated:

> DPH does not have jurisdiction over [unlicensed] facilities and cannot oversee the quality of the services they provide.  However, if these facilities are providing medical care or advertising services that are consistent with a clinic, DPH . . . may be involved in investigating complaints regarding allegations about provision of inappropriate medical services or staff members performing services without the required credentials.  This work may be done in collaboration with the Attorney General's Office's Reproductive Justice Unit.

Id. at 10–11.  The press release conveyed that DPH actively seeks feedback and complaints from

individuals with experience concerning PRCs, as well as other stakeholders with information

about questionable practices.  Id. at 11.  It also linked to the contemporaneous guidance

memorandum for Massachusetts licensees.  Id.

Unlike the guidance, the press release expressly addressed and critiqued the operations of

PRCs.  Furthermore, the press release referenced DPH's ability to investigate PRCs suspected of

performing unsafe or unlicensed medical services and mentioned potential action by the Attorney

General's Office.  However, the critical question here is whether DPH invoked these regulatory

powers "to convey a threat of adverse government action in order to punish or suppress [YOM's]

speech."  Vullo, 602 U.S. at 191.  The text of the press release does not plausibly support such a

finding.

The press release's criticism of PRCs focused on the medical services and quality of care

offered by these centers, not their viewpoints.  For example, the press release noted that PRCs

"do not provide abortion care or abortion referrals, contraception, or other important

reproductive health care services" even though many "advertise themselves as full-service

reproductive health care clinics."  Doc. No. 64-3 at 10.  It also flagged that most PRCs are not

"licensed" and thus "are largely staffed by nonmedical individuals or volunteers."  Id.  To the

**Add.32**

extent the press release raised the possibility of legal action against PRCs, it did so in reference

to facilities that engage in practices violating medical standards and requirements set by the state.

The only time the press release mentioned a non-medical detail about PRCs was the

following sentence: "Most centers are affiliated with national advocacy or religious

organizations that provide funding and support to advance an anti-abortion agenda." Id.  But

simply pointing out the political and religious ties of PRCs as a factual matter does not amount to

targeting PRCs for their political and religious speech.[17]  Id.  Indeed, any concern that the press

release identified about PRCs was not about their speech or viewpoint, but rather about their

noncompliance with governing laws.  YOM has not plausibly alleged that these discussions of

medical compliance, which reflect topics squarely within DPH's regulatory purview,

transgressed into impermissible threats.

Furthermore, a significant portion of the press release was dedicated to warning the

public about the dangers of unlicensed PRCs, which fall outside of DPH's oversight.  The press

release specifically mentioned potential prosecution by the Attorney General's Office in the

context of discussing unlicensed PRCs that provide inappropriate medical services.  These

cautionary statements do not apply to YOM, which is a licensed medical entity.  Accordingly,

YOM cannot raise a plausible free speech claim arising from the portions of the release

discussing unlicensed PRCs.

---

[17] It is true that YOM's stance of not providing abortions, not recommending abortions, and not referring patients to abortion providers is informed by its religious views.  But nothing in DPH's communications interferes with or threatens YOM's religiously motivated decision to not discuss or provide certain services.  DPH has not, for instance, sought to sanction YOM for not providing abortions or referring patients to abortion services.  Nor has DPH required YOM to discuss the option of abortion with patients.  Cf. Nat'l Inst. of Fam. & Life Advocs. v. Becerra, 585 U.S. 755, 778 (2018) (striking down state law requiring PRCs to provide notice of abortion services available to patients).

**Add.33**

Regarding licensed PRCs in particular, the press release stated the following:

> Licensed clinics must comply with the requirements and standards of medical care and services associated with this certification.  Licensed clinics usually are staffed with full- or part-time medical providers that may include physicians, nurses, nurse practitioners, or physician assistants.  These licensed facilities may provide medical services, including testing and ultrasound, as long as the service delivered is within the scope of practice for the involved provider.  The clinicians in licensed centers bear a responsibility to adhere to all license requirements and meet the professional standards to ensure the well-being of those seeking care and support.

Id. at 10.  These neutral, descriptive statements about licensed entities do not plausibly suggest unconstitutional threats to suppress speech.

Accordingly, YOM has not plausibly alleged that the press release violates its free speech rights.  The press release criticized the operations of PRCs, which DPH was permitted to do.  It raised potential enforcement action against PRCs for the provision of out-of-scope medical services, which DPH, again, was permitted to do.  Finally, the release noted that, as a result of concerns about some PRCs, DPH initiated an effort to ensure compliance with governing rules by all licensees and linked to the guidance letter noted above.  The release and the guidance letter do not plausibly suggest an improper, selective focus on PRCs based on their views; rather, DPH warned every licensee.  While DPH is prohibited from using its regulatory powers to stamp out disfavored speech, it is authorized to use its powers to stamp out improper or unsafe medical practices.

### 3.    *DPH's February 2024 Letter*

The complaint alleges only one government communication made directly and individually to YOM: the letter from DPH dated February 29, 2024, following up on the department's investigation into YOM's operations.  Cf. Bantam Books, 372 U.S. at 61 (book distributor received at least thirty-five notices from state commission).  According to YOM, DPH conducted this investigation in response to Defendant Holder's October 2023 complaint,

34

**Add.34**

and the "sole change DPH required Plaintiff to make was an amendment to its Policies and Procedures Manual concerning the criteria for ultrasound exams, eliminating any language that allowed for sonographer discretion." Doc. No. 64 ¶ 49. The February 29 letter followed up on this investigation and said, in its entirety:

> On February 19, 2024, we conducted a desk audit follow-up review to verify that your facility had achieved and maintained compliance. The findings indicate that all deficiencies have been corrected. You are reminded that facilities are obligated to correct all deficiencies and then remain in compliance. An unannounced visit may be conducted at any time at the discretion of the MA Department of Public Health Licensure Unit.

Id. ¶ 50.

This letter cannot reasonably be construed as being unconstitutionally threatening or coercive. The communication was mostly positive—the letter confirmed that YOM corrected all deficiencies and met compliance. While the letter conveyed DPH's authority to ensure continuing compliance and to conduct unannounced visits, the government does not violate the First Amendment simply by communicating the scope of its powers to a regulated entity. Critically, the letter did not state, or even remotely suggest, that DPH was marshaling its regulatory authority to suppress YOM's constitutionally protected speech or to retaliate against YOM for its speech. The letter said nothing at all about YOM's viewpoint or speech. Unlike in Vullo, where the superintendent expressly threatened to take enforcement action only against insurance companies that affiliated with pro-gun advocacy groups, the letter here did not express or insinuate that YOM would be subjected to further enforcement action unless it changed its pro-life stance. Far from constituting a threat, the letter reflects a garden-variety communication from a regulator to a regulated entity providing reminders about compliance and closing out a matter.

**Add.35**

Therefore, the letter and DPH's related investigation into YOM cannot be plausibly understood as an unconstitutional threat.  DPH conducted a single investigation into YOM in response to Holder's complaint, which YOM does not argue was facially unsupported or frivolous.  Indeed, Holder's complaint cited a public statement by YOM's Executive Director, which arguably suggested that YOM was either offering out-of-scope ultrasound services or deceptively advertising its services.  Doc. No. 64-2 at 16–17.  As a result of the investigation, DPH asked YOM to make a discrete change to its internal manual regarding the criteria for ultrasound exams—a requirement that bears some connection to the allegations in Holder's complaint.  YOM does not contend that this required revision to its manual was improper in any way, let alone that it suppressed protected speech.  Once YOM made this correction, DPH confirmed compliance.  Nothing about this sequence of events suggests that DPH sought to use its regulatory powers to suppress YOM's speech.  YOM does not allege that the manner in which DPH conducted its one-time investigation was overly burdensome, unfair, or coercive.  YOM also does not allege that DPH selectively conducted this investigation while ignoring similar complaints against other licensed entities.  Nor has YOM alleged that DPH subjected it to any subsequent enforcement actions, such as unannounced visits or additional investigations.

The complaint mentions one other regulatory action concerning YOM.  YOM alleges that it has received two subpoenas as part of an investigation brought by the Board against YOM's medical director.  Doc. No. 64 ¶ 53.  YOM lists these subpoenas as examples of "threats" that "target Plaintiff solely because of its pro-life and religious beliefs."  Id. ¶ 234.  However, the Board is statutorily required to investigate all complaints relating to the proper practice of medicine by any physician.  Mass. Gen. Laws ch. 112, § 5.  And, as YOM itself alleges, the Board commenced this investigation "based on Defendant Hart Holder's October 2023

**Add.36**

complaint." Doc. No. 64 ¶ 52. That the Board followed its statutory duty to investigate a complaint does not plausibly show an intentional decision to target YOM based on its speech and beliefs, particularly where DPH's investigation from the same complaint resulted in a finding of "deficiencies" (which were later corrected). Doc. No. 64-3 at 1.

YOM suggests that the Board's subpoenas were improper because "many of the documents requested did not concern Plaintiff's mobile unit [the subject of the October 2023 complaint by REN]." Doc. No. 64 ¶ 54. It also notes that "most of the documents subpoenaed pertained to a period of time during which Plaintiff's mobile unit was not in service." Id. ¶ 56. YOM concludes that these subpoenas show that Holder is "utilizing (or colluding with) the government to conduct a fishing expedition into [YOM]" "solely because it is operating a pro-life pregnancy center." Id. ¶ 58.

YOM's contentions are unavailing. First, YOM has alleged no facts nor identified any law or regulation barring the Board from investigating or seeking information beyond the specific focus of a complaint. In fact, YOM unsuccessfully sought to enjoin one of the Board's subpoenas in a proceeding of which this Court takes judicial notice. There, the state court noted that the Board "has broad authority to regulate the conduct of the medical profession" and concluded that the "the documents sought [by the subpoena] are relevant to the Board's investigation and do not exceed the scope of its authority under [Mass. Gen. Laws ch.] 112, § 5 or its regulations." A Woman's Concern, Inc. v. Bd. of Registration in Med., No. 2481CV01789 (Middlesex Super. Ct. Aug. 2, 2024) (emphasis added). YOM did not appeal this decision to a

**Add.37**

higher court or seek to enjoin the other subpoena.[18]  Nor does YOM seek any relief from this Court as to the Board's investigation.

Moreover, any allegation about the Board's misconduct cannot be litigated in this lawsuit, where neither the Board nor any of its officials are parties.  The amended complaint does not allege that any of the named Defendants work for the Board, are involved in the Board, or have supervisory control over the Board.  That Defendant Holder filed the complaint that allegedly led to the Board's investigation of YOM does not sufficiently plead that Holder or any Defendant bears liability for the Board's independent actions in initiating and carrying out its investigation.  While YOM attempts to sweep in the Board's regulatory actions with other actions taken by Defendants, the Court declines to take such a far-reaching view of Defendants' liability where YOM has alleged no facts plausibly linking Defendants to the Board's actions.[19]

4.    *Miscellaneous Campaign Materials*

YOM's free speech claim also includes allegations about the coercive and threatening nature of the government's public education campaign.  In particular, YOM takes issue with the government's campaign materials describing PRCs as "dangerous" "public health threats" and accusing them of "deceptive advertising."  Doc. No. 64 ¶ 235.  Citing this language choice, YOM contends that "Defendants condemned Plaintiff for providing care based on its moral and religious beliefs rather than based on Defendants' preference for abortion."  Id.

---

[18] YOM did not promptly comply with the other subpoena, and the Board moved to compel compliance in state court.  See Bd. of Registration in Med. v. A Woman's Concern, Inc., No. 2484CV00502 (Suffolk Super. Ct. Feb. 21, 2024).  YOM filed an opposition to that motion but subsequently agreed to comply with the subpoena before the court issued a ruling.  The parties then stipulated to dismissing the case.

[19] The Court identifies a similar issue with YOM's allegations about vandalism.  The amended complaint dedicates several paragraphs to describing how YOM has been vandalized on multiple occasions.  Doc. No. 64 ¶¶ 28–35, 39–43.  However, YOM does not allege or argue that Defendants were involved in the acts of vandalism or that they failed to investigate the vandalism after the filing of a report.

**Add.38**

Defendants employed strong language to condemn PRCs.  In describing PRCs, Goldstein expressed, "I'm resolute about calling out this deception for what it is: a public health threat." Id. ¶ 80.  The state issued billboards, posters, and webpages urging the public to "Avoid Anti-Abortion Centers."  Doc. No. 64-3 at 19–21; Doc. No. 64-8 at 4.  One campaign factsheet stated that PRCs "can put your health at risk" and warned that they "may use **deceptive advertising**," "**delay your care**," use "**untrained staff and volunteers**," and "provide **misinformation** about abortion."  Doc. No. 64-8 at 4.[20]  But as explained above, this case is not about whether government officials can voice harsh, aggressive, or scalding criticisms against those with opposing viewpoints—YOM agrees they can.

According to YOM, though, Defendants' "language constituted accusations of criminal conduct, not political criticism."  Doc. No. 80 at 16.  YOM repeatedly emphasizes that Defendants' campaign employed criminal threats against PRCs.  See Doc. No. 64 ¶ 272; Doc. No. 80 at 6, 21; Doc. No. 81 at 9, 14, 15, 17.  However, the amended complaint does not plausibly allege that Defendants threatened criminal punishment at all, let alone that they did so to suppress YOM's speech.

The Court begins with the term "deceptive advertising."  YOM argues that the term "deceptive advertising" implies conduct that violates 243 Mass. Code Regs. 2.07(11)(a)(1).  Doc.

---

[20] YOM also includes allegations about words from the internal "Creative Brief" used to plan the campaign's creative strategy.  See Doc. No. 64 ¶¶ 149–155 (noting Creative Brief included slogans like "WOLF IN SHEEP'S CLOTHING" and "FREE ISN'T ALWAYS FREE").  YOM quotes this language to argue that the "state-funded campaign repeatedly used incendiary language to portray PRCs as predatory, dangerous, and deceitful."  Doc. No. 80 at 16.  But the Creative Brief was an internal government planning document, not material distributed to PRCs or to the public.  Nor were the cited messages from the Creative Brief ever used in the public campaign.  In fact, the Creative Brief includes a disclaimer that the phrases included in the brief "are not verbatim messaging options—rather directional paths for the creative to follow."  Doc. No. 67-7 at 32.  Therefore, words from the internal Creative Brief cannot plausibly establish the communication of a threat to PRCs.

39

**Add.39**

No. 80 at 16.  The purpose of that regulation is to "ensure that the Board issues certificates of registration only to qualified competent physicians of good moral character and to strengthen the Board's licensing processes."  243 Mass. Code Regs. 2.01(1).  That regulation does not establish criminal penalties for the violation of its terms.  The Board enacted this regulation pursuant to its authority derived from civil, not criminal, statutes.  Id. at 2.01(2) ("The Board adopts 243 CMR 2.00 under the authority of M.G.L. c. 13, §§ 9 through 11; M.G.L. c. 112, §§ 2 through 12DD; and M.G.L. c. 112, §§ 61 through 65E and 88.").  In light of these facts, YOM has not plausibly explained how the phrase "deceptive advertising" relays a threat of criminal punishment.

YOM also asserts that the label of "deceptive advertising" amounted to "targeted, false, and baseless accusations establish[ing] a system of informal censorship designed to suppress the pro-life viewpoint of Plaintiff YOM with the intent to obstruct, chill, deter, and retaliate against Plaintiff YOM's speech."  Id. ¶ 260.  In essence, YOM argues that the campaign's accusations of "deceptive advertising" by PRCs were false and baseless, and it asks the Court to infer that these statements were not intended to combat deceptive advertising at PRCs, but to stifle protected speech by YOM and other PRCs.  But YOM's conclusory assertions are unsupported by the factual allegations in the amended complaint.  First, YOM has not plausibly alleged that Defendants' statements warning the public about potentially deceptive advertisements by PRCs were "targeted" at YOM.  These statements were made in the context of widely disseminated campaign materials discussing PRCs generally.  There are no factual allegations that the state accused YOM specifically of engaging in deceptive advertising or subjected it to any enforcement action under state medical advertising laws.

Second, the amended complaint does not plausibly allege that the state's criticisms of PRCs for deceptive advertisements were "false" and "baseless."  Indeed, exhibits attached to the

**Add.40**

amended complaint reveal that in 2023, a class-action lawsuit was filed against another Massachusetts PRC for deceptive advertising and out-of-scope medical practices after the center misdiagnosed a patient as having a viable pregnancy, even though she faced a life-threatening ectopic pregnancy.  Doc. No. 64-2 at 20; Doc. No. 64-4 at 11.  In light of these concerning allegations, which were brought to DPH's attention by REN's second complaint, a state's effort to raise public awareness about possible deceptive advertising at PRCs on a general level cannot plausibly be understood as false or baseless accusations constituting threats to infringe upon YOM's free speech rights.  See 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 486 (1996) (confirming that state-coordinated "educational campaigns focused on drinking problems" would "not involve any speech restrictions"); Nat'l Inst. of Fam. & Life Advocs. v. Raoul, 685 F. Supp. 3d 688, 704 (N.D. Ill. 2023) (noting that government could have prevented deception at PRCs "through a public awareness campaign" because "[m]ore speech is the solution; not restricting unpopular speech").

Similarly, YOM has not plausibly alleged that campaign materials describing PRCs as a "public health threat" relayed a threat of criminal punishment or violated its free speech rights. YOM contends that that the phrase "public health threat" constitutes a coercive threat because it "carries legal significance beyond mere political rhetoric."  Doc. No. 80 at 16.  It notes that "Massachusetts courts use this precise terminology to describe genuine regulatory emergencies," such as "the transmission of blood-borne diseases by intravenous drug abusers."  Id.  But this example does not support YOM's contention that the phrase "public health threat" represents a direct threat of criminal (or civil) punishment.  YOM also does not explain why Defendants should be barred from expressing their opinions on what constitute "genuine regulatory emergencies."  Defendants' view that PRCs pose a legitimate danger to patient safety is an

**Add.41**

opinion that they are allowed to convey to the public, even if others may disagree.  For example, some government officials may voice their opinion that remaining unvaccinated from measles poses a "public health threat."  Other officials may characterize the measles vaccine itself as a "public health threat" or an encroachment on individual liberty and urge their constituents to avoid them.  These forms of expressive activity are part and parcel to our political system.  A government's use of the phrase "public health threat" does not automatically cross the line from permissible government speech to an unconstitutional threat.  And the fact that the government speaker possesses regulatory authority does not transform the phrase into a coercive threat or alternatively require the speaker to refrain from voicing their views.  YOM also has not identified any statutory or regulatory action that would flow from such labeling.

Similarly, campaign materials urging the public to "Avoid Anti-Abortion Centers" express the state's criticism of the scope of medical services and care that PRCs provide to patients.  This language is not, as YOM argues, akin to the state telling the public to "Avoid Houses of Worship."  Doc. No. 80 at 19–20.  Neither PRCs generally nor YOM facilities in particular are houses of worship, and YOM does not allege otherwise.  They are centers that provide medical and other services to pregnant women.  Not all PRCs are even religiously affiliated.  Id. at 10.  YOM does not plausibly allege the state's campaign materials condemn it or other PRCs because of their religious beliefs; instead, the campaign materials are focused on the state's debatable assessment that these centers pose health and safety risks to patients.  See, e.g., Doc. No. 64-3 at 28 (warning that anti-abortion centers "may mislead pregnant people about their options, delay their care, and can put their health at risk").  YOM may disagree with this assessment, but that disagreement does not transform the state's speech into a threat.

**Add.42**

Moreover, campaign materials providing information on how the public can report complaints against PRCs to the Attorney General's Office do not invoke criminal punishment or reflect threats to silence YOM's speech. YOM specifically references a postcard developed by DPH that states: "If you have been to an anti-abortion center and have concerns about your experience, you can file a complaint online or call the Attorney General's Civil Rights Division." Doc. No. 64-8 at 3. This postcard, which references a civil division of the Attorney General's Office, does not reasonably indicate or imply that PRCs would face criminal prosecution because of their viewpoint. Furthermore, providing a means for patients to submit complaints to the government about their experiences with PRCs does not amount to unconstitutional suppression of speech or religion; it implements the right to petition the government—a right also secured by the First Amendment.

Finally, YOM's reliance on Backpage.com, LLC v. Dart, a non-binding case from the Seventh Circuit, is not apt here. There, a county sheriff directly wrote a letter to credit card companies threatening legal action against them for allowing their credit cards to purchase advertisements on Backpage's website. 807 F.3d 229, 231 (7th Cir. 2015). In the letter, which was written on stationery captioned "Office of the Sheriff," the sheriff demanded that the companies "cease and desist" from allowing their cards to be used to buy advertising on Backpage and specifically enumerated a criminal money-laundering statute. Id. The letter attacked the companies in an accusatory tone: "Your [credit] cards have and will continue to be used to buy ads that sell children for sex on sites like Backpage.com." Id. at 232. The sheriff concluded the letter with a demand that the companies "provide [him] with contact information for an individual within your organization that I can work with . . . on this issue." Id. The letter worked; upon receipt, the companies blocked their credit cards from purchasing ads on

43

**Add.43**

Backpage's website.  Id.  There, the Seventh Circuit held that Backpage was entitled to a preliminary injunction on its claim that the letter constituted an impermissible threat in violation of the First Amendment.

The state's campaign against PRCs is materially different.  For one thing, Backpage.com involved an official's communication to third parties threatening those parties with criminal prosecution unless they stopped their business relationship with the plaintiff.  Here, there are no allegations that state officials threatened any third parties with prosecution unless they cut ties with YOM.  Beyond that central distinction, the sheriff's statements in Backpage.com are plainly distinguishable from the communications at issue here.  In Backpage.com, the sheriff issued an official "cease and desist" demand and expressly invoked a federal criminal statute.  By contrast, state officials' characterization of PRCs as "public health threats" and "deceptive" entities neither conveyed any demands nor hinted at potential criminal prosecution.  Backpage.com also involved a letter that was written, sent, and targeted to specific entities.  Here, YOM challenges broadly disseminated materials designed to provide information to the general public— information that included Defendants' opinion that members of the public should evaluate their options before selecting a medical provider, along with Defendants' view that PRCs generally are not optimal places to receive medical care or advice.

Overall, YOM's characterization of Defendants' campaign materials as threats to stifle its speech and viewpoint is not plausible.  The campaign materials express the state's opinions about the services provided by PRCs.  These opinions, though strong, do not plausibly tread beyond the bounds of constitutional government speech.

     5.    *REN's Statements*

In addition to challenging the state's speech about PRCs, YOM takes issue with various statements made by REN.  Doc. No. 64 ¶¶ 90–108.  Assuming for the sake of the analysis that

**Add.44**

REN qualifies as a state actor, YOM has failed to sufficiently allege that REN's actions unconstitutionally suppress its speech.

First, the facts do not indicate that REN holds any direct enforcement authority over YOM. The only allegations connecting REN to any semblance of enforcement power pertain to its ability to file complaints against PRCs with the government—a power held by any ordinary member of the public. That REN has previously filed a complaint against YOM does not plausibly show that it possesses regulatory authority over YOM. Furthermore, YOM conceded at the motion hearing that REN was a state actor only for the purposes of the public education campaign, and not for the purposes of exercising the state's coercive authority against YOM or other PRCs. This cuts against YOM's assertion that REN's statements criticizing and identifying PRCs amount to coercive threats. Kennedy v. Warren, 66 F.4th 1199, 1210 (9th Cir. 2023) (finding no unconstitutional threat in part because official lacked "unilateral regulatory authority" over plaintiff).

Second, any of REN's statements denouncing PRCs as "deceptive" and "dangerous" and urging the public to avoid them do not plausibly amount to unconstitutional threats for the same reasons described above for the state's campaign materials. YOM has not sufficiently pled that REN suppresses YOM's free speech rights simply by exercising its own right to forcefully advocate against the scope of care that PRCs provide.

Third, YOM has not plausibly alleged that REN's materials listing PRCs, including YOM, by name interfere with YOM's protected speech. One of these lists is published on REN's webpage entitled, "What Are Anti-Abortion Centers," which provides information about the anti-abortion stance of PRCs to prospective patients. Doc. No. 64-3 at 30. In the context of encouraging patients seeking abortion care to "double check" the type of provider they visit, the

**Add.45**

webpage lists all the PRCs in New England, including YOM.  Id. at 30–31.  Merely informing the public about which facilities are PRCs and urging patients to research facilities before seeking abortion services does not plausibly constitute an impermissible threat against YOM.  REN publishes another list of PRCs in a "guide to identifying & taking action against anti-abortion centers in New England," which criticizes what REN says are unsafe and deceptive practices at PRCs and reminds readers about ways to report negative experiences at PRCs.  Doc. No. 64-4 at 1, 11–12, 23.  While the guidebook identifies YOM by name, it does not plausibly amount to unconstitutional threats directed at silencing YOM's viewpoint or speech.  Instead, these statements pinpointing PRCs and criticizing their operations are protected by REN's "own undoubted right under the First Amendment to mobilize public opinion on the subject of" anti-abortion facilities.  Connell v. Signoracci, 153 F.3d 74, 82 (2d Cir. 1998) (noting that government official is "privileged, for example, . . . to call the topless bars a 'black eye on the community' and a 'slimy business,' and to call for a boycott of the establishments").

Instead of wielding any enforcement authority against YOM, REN has leaned on its persuasive authority—promulgating public communications condemning the work of PRCs and urging the public to avoid them.  This type of expressive advocacy, which exists within the scope of REN's own free speech rights, does not ground a plausible First Amendment claim.

### 6.    *Totality of the Circumstances*

Mindful of the Supreme Court's admonition to consider the facts "in context," Vullo, 602 U.S. at 191, as well as the holistic framing of YOM's allegations, the Court considers all of the alleged actions as a whole.  Even viewed collectively, YOM fails to plausibly allege threats of state action (implicit or express) for continued or future exercise of its First Amendment rights.

**Add.46**

At the request of YOM, the Court considers the totality of the circumstances using the four-factor test from Vullo.[21]  There, the Supreme Court considered the following, non-exhaustive list of factors "to determine whether a challenged communication is reasonably understood to be a coercive threat": "(1) word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and, perhaps most importantly, (4) whether the speech refers to adverse consequences." Id. at 189.  Applied to this case, this four-factor test does not demonstrate that YOM has sufficiently pled its free speech claim.

Regarding the first factor—word choice and tone—Defendants used strong language to criticize the medical standards and services provided by PRCs.  Government officials are free to use forceful, even condemnatory language to criticize opposing viewpoints.  See Kennedy, 66 F.4th at 1204, 1208 (noting that Senator Warren's letter denouncing Amazon's promotion of certain books as "peddling misinformation about COVID-19 vaccines and treatments" and as "unethical, unacceptable, and potentially unlawful" was permissible government criticism).  What matters is whether the particular words were used "to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech."  Vullo, 602 U.S. at 191.  Here, YOM fails to plausibly show that Defendants levied their criticisms in order to punish or silence YOM's constitutionally protected speech.  Defendants cautioned the public about dangerous and deceptive practices at PRCs.  Facially, these communications sought to proscribe

---

[21] YOM portrays this test as the "governing standard for when government speech crosses the line into coercion."  Doc. No. 80 at 14.  However, the Supreme Court did not prescribe the four-factor test as the only, or even the preferred, method of evaluating this question.  Instead, the Court recognized that lower courts use different fact-intensive approaches when addressing this issue.  Vullo, 602 U.S. at 190.  The Court also agreed that the four factors YOM invokes are "just helpful guideposts in answering the question whether an official seeks to persuade or, instead, coerce."  Id. at 191.

**Add.47**

the provision of unsafe medical services, not religious viewpoint or speech, and to persuade the public on how to make certain choices about medical care.

This connects to the second and fourth factors—the existence of regulatory authority and reference to adverse consequences. To the extent Defendants communicated potential enforcement actions by DPH or the Attorney General's Office, they did so in the context of investigating facilities suspected of performing out-of-scope, unsafe, or unlawful medical services. The factual allegations indicate that Defendants used their regulatory authority and raised potential adverse consequences in order to promote compliance with the state's medical laws, regulations, and rules—which apply to all medical entities, not just YOM. And, DPH issued reminders about these laws in a guidance memorandum sent to all licensees, rather than in targeted communications to YOM or PRCs. That Defendants internally sought to put PRCs "on notice" about these reminders does not bring this case closer to Vullo. Here, there is no plausible showing that Defendants targeted YOM with threats of enforcement action because of its viewpoint or speech or that they unevenly applied the state's medical laws based on an entity's views. Unlike the superintendent in Vullo, Defendants did not wield their regulatory authority in a quid pro quo manner. They did not tell PRCs that they could avoid liability for laws and regulations if they shed their pro-life views or religious beliefs. They did not tell doctors that they could receive a regulatory benefit if they declined to work with PRCs. Defendants simply reminded PRCs and other entities that they must comply with generally applicable laws and regulations. That is the normal work of government officials, not an improper exploitation of state power.

As for the remaining factor—the perception of the recipient—YOM alleges that Defendants' statements "would cause a reasonable person to perceive such statements as a threat

48

**Add.48**

against [PRCs]." Doc. No. 64 ¶ 272. But again, the crucial question is whether a reasonable person would have perceived these statements as threats to suppress or punish speech. A public health official's stern reminder to all licensees to comply with generally applicable licensure laws or risk losing their license may be perceived as a "threat" of enforcement action, but such threat does not violate the Constitution unless it invokes enforcement to retaliate against or suppress constitutionally protected speech. No fact suggests that any of the Defendants used or threatened enforcement action to interfere with YOM's speech. Not to mention, many of the "threatening" statements that YOM cites are from internal government documents, not communications disseminated to PRCs or the public. YOM fails to explain how internal discussions never meant to be seen by PRCs could have communicated threats. Similarly, YOM broadly alleges that one of its doctors quit "as a direct result of Defendants' intimidation campaign," Doc. No. 64 ¶ 240, but fails to provide any non-conclusory factual allegations to render plausible its assertion that Defendants' actions prompted the doctor's resignation.

Overall, YOM's allegations, considered together and in context, do not plausibly plead that Defendants employed coercive threats to silence YOM's speech. Accepted as true and with all reasonable inferences drawn in YOM's favor, the non-conclusory facts in the amended complaint show the existence of a deeply divisive issue concerning reproductive healthcare and abortions. They show that state officials took a side on the issue, using assertive language to promote abortion access and criticize the scope of services offered by PRCs. However, they do not plausibly suggest that any Defendant took or threatened regulatory action because YOM neither refers patients for abortions nor recommends abortions. Rather, the allegations reveal that DPH—an agency charged with protecting the health of the public—urged medical facilities, including PRCs, to abide by various medical laws to ensure patient safety. DPH also conducted

**Add.49**

a single investigation into YOM based on a fact-supported complaint raising concerns about potentially deceptive and unsafe practices and required a discrete change to YOM's manual, an outcome which YOM does not challenge as improper.

The facts do not suggest that Defendants overstepped in taking enforcement action against YOM.  YOM does not allege that DPH conducted this investigation while ignoring comparable complaints against other entities.[22]  Furthermore, there are no factual allegations that Defendants told YOM or other PRCs that they could avoid enforcement by espousing different viewpoints.  The facts also do not show that the government threatened intermediaries with punishment for affiliating with YOM.  Cf. Vullo,  602 U.S. at 198; Backpage.com, 807 F.3d at 234.  Nor do they show that officials brandished criminal prosecution or deployed the police to intimidate YOM into silence.  Cf. Bantam Books, 372 U.S. at 63; Backpage.com, 807 F.3d at 232.  Indeed, there is no indication whatsoever that the government took any direct action to bar YOM from continuing to express its constitutionally protected speech or impliedly threatened YOM with enforcement action based on its views.  YOM alleges that it has experienced a reduction in patients and may be forced to shut down as a result of Defendants' campaign.  Doc. No. 64 ¶¶ 276–277.  As noted at the outset, public officials, including Defendants, are entitled to compete for the hearts and minds of the public—as is YOM.  The amended complaint, however, is utterly devoid of allegations that Defendants employed enforcement powers or threats to coerce patients to stop seeking the services of YOM or any PRCs.  Cf. Vullo, 602 U.S. at 198; Backpage.com, 807 F.3d at 234.

---

[22] To the extent that YOM advances this argument, the Court addresses it under YOM's Equal Protection Clause claim.

**Add.50**

One further point bears mention.  The amended complaint plausibly alleges that Defendants not only support access to abortion but also harbored concerns regarding PRCs, including that some (not YOM) were dispensing medical services without a license, that some or many engaged in misleading advertising, and that many were preventing patients from accessing a full range of reproductive healthcare options (namely, abortion care).  The amended complaint plausibly alleges that these concerns animated the campaign as well as DPH's decision to remind all licensees of various obligations imposed by state law.  Even if DPH's reminder to all licensees was really a targeted warning just to PRCs to comply with the law (although no reasonable recipient of the letter would so conclude), that is not sufficient to state a claim for the violation of YOM's free speech rights.  YOM would also need to plausibly allege, based on non-conclusory factual allegations, that this targeted warning was because of YOM's views, as opposed to conduct by PRCs arguably raising concerns under state laws.  Not only are there no such allegations, but the factual allegations YOM advances reveal government statements and actions tightly tailored to enforcing the law.  And YOM makes no claim that it is exempt (or PRCs as a group are exempt) from compliance with governing state laws.  Finally, the Court does not omit an analysis of selective enforcement but rather addresses it as part of the discussion of Count III.

Based on the foregoing reasons, the Court ALLOWS the motions to dismiss Count I.

B.    Count II: Free Exercise Claim

Next, YOM brings a First Amendment claim under the Free Exercise Clause.  The Free Exercise Clause, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise" of religion.  U.S. Const. amend. I; see Cantwell v. Connecticut, 310 U.S. 296, 303 (1940).  "When a religiously neutral and generally applicable law incidentally burdens free exercise rights," its constitutionality depends

**Add.51**

on whether the law "is rationally related to a legitimate governmental interest." Does 1-6 v. Mills, 16 F.4th 20, 29–30 (1st Cir. 2021) (citing Fulton v. City of Philadelphia, 593 U.S. 522, 533 (2021)).  However, the "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature" or when a law "single[s] out religion or religious practices." Id. at 29.  In those circumstances, the Court may sustain the conduct or law only if it is narrowly tailored to achieve a compelling governmental interest.  Id.

YOM contends that Defendants' actions "specifically target and burden Plaintiff's religious exercise by creating a hostile regulatory environment for faith-based healthcare providers." Doc. No. 64 ¶ 302.  There are several deficiencies in YOM's claim.  To begin, YOM does not point to any law or policy that burdens its religious practice.  Additionally, none of Defendants' actions or speech have prohibited YOM from identifying and operating as a Christian, life-affirming healthcare organization.  The fact that YOM has faced a reduction in clients—even if a plausible by-product of the state's campaign—does not violate the Free Exercise Clause.  The constitutional guarantees of religious freedom do not include the right to successfully operate or the right to run a healthcare clinic sheltered from the effects of opposing views or competition.  Moreover, the state has not forced YOM into providing abortions or other services that violate its religious beliefs.  Pursuant to its religious conviction, YOM can continue to provide information about alternatives to abortions and medication abortion reversals.  These considerations are important because the "threshold" question of a Free Exercise Clause claim is "whether the plaintiff's free exercise is interfered with at all." Parker v. Hurley, 514 F.3d 87, 99 (1st Cir. 2008) (citation modified).  Here, there is no plausible showing that Defendants' actions have interfered with YOM's exercise of its Christian faith.  The only thing Defendants have told

**Add.52**

YOM it cannot do is violate medical laws, regulations, and standards that apply to all licensed medical entities in Massachusetts. And YOM does not allege that any of these licensure laws infringe upon its ability to freely exercise its religion, nor does it challenge these laws' application to its operation as a licensed clinic.

YOM argues that the state's public education campaign is "explicitly and facially targeted at the religious activity of PRCs." Doc. No. 64 ¶ 301. To support this claim, YOM points to one line from DPH's January 3, 2024, press release: "Most centers are affiliated with national advocacy or religious organizations that provide funding and support to advance an anti-abortion agenda." Id. This statement does not disfavor religion in any way. It merely conveys a fact about "most" PRCs that YOM does not challenge. Beyond this single sentence, YOM cites no other public-facing government communications mentioning the religious beliefs of PRCs or expressing hostility toward religion. Instead, most of the campaign statements that YOM takes issue with involve statements criticizing PRCs' "dangerous" and "deceptive" medical practices, which target PRCs based on the quality of their medical care and advertising practices, not their religious beliefs. None of the challenged campaign materials explicitly or facially discriminate against YOM's religious practice.

Of course, government actions may still violate the Free Speech Clause even though they appear neutral on the surface. "Facial neutrality is not determinative." See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah., 508 U.S. 520, 534 (1993). "[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." Id. at 533. But here, YOM has not plausibly alleged that the object of the state's public education campaign was to suppress its religious practice. The campaign focused on combatting the arguably deceptive and out-of-scope practices of some PRCs, not all of which are even

53

**Add.53**

religiously affiliated according to YOM.  There is no allegation that Defendants singled out religious PRCs for worse treatment than non-religious PRCs.  See Does 1-6, 16 F.4th at 30 (holding government action "generally applicable" because it does not permit "secular conduct that undermines the government's asserted interests in a similar way").

Nor has YOM alleged any facts that allow the Court to infer that Defendants were driven by religious animus.  YOM points to one internal document showing that the planners of the campaign were cognizant about many PRCs' religious ties.  Doc. No. 64 ¶¶ 133–134.  A PowerPoint used by campaign planners includes a note that inquires, "How do we want to tackle/address religious aspects of these places."  Doc. No. 64-6 at 39.  This statement does not plausibly reveal religious hostility, nor does it suggest that suppressing YOM's religious practices was the object of the campaign.  Indeed, another PowerPoint slide includes a note that the campaign should avoid focusing on PRCs' religious ties because doing so could impact how "patient populations with strong faith-based abortion views" "receive the campaign."  Doc. No. 64-7 at 1.  These internal communications, which reveal that state officials sought to disentangle the campaign from religious issues, do not show that religious animus served as a motivating factor.  These circumstances differ greatly from cases cited by YOM, where government officials made multiple comments expressing hostility against particular religious beliefs.  Church of Lukumi Babalu Aye, 508 U.S. at 540–42 (city officials described religion as "sin," "foolishness," and "abhorrent"); Masterpiece Cakeshop v. Colo. C.R. Comm'n, 584 U.S. 617, 618 (2018) (state officials disparaged business owner's faith as "despicable" and "compared his invocation of his sincerely held religious beliefs to defenses of slavery and the Holocaust").

For the foregoing reasons, YOM has not plausibly alleged that Defendants' conduct was targeted towards its religious practices and beliefs.  To the extent Defendants threatened any

54

**Add.54**

enforcement action, YOM has not sufficiently alleged that they made the threats because of YOM's religious views.  Accordingly, rational-basis review applies.  YOM has not sufficiently alleged that Defendants' actions were not rationally related to a legitimate government interest. Defendants acted with the stated purpose of protecting patient safety and ensuring compliance with medical laws.  See also Washington v. Glucksberg, 521 U.S. 702, 731 (1997) ("The State . . . has an interest in protecting the integrity and ethics of the medical profession.").  Defendants issued communications reminding medical providers about their obligations under state laws and published public education materials warning pregnant patients about improper medical practices at PRCs.  In doing so, they carried out the state legislature's directive to launch a "public awareness campaign to educate providers and the public about crisis pregnancy centers and pregnancy resource centers and the centers' lack of medical services."  Doc. No. 64 ¶ 90. Because these actions easily pass rational-basis review, the Court ALLOWS the motions to dismiss Count II.

## C.    Count III: Equal Protection Claim

Finally, YOM advances an Equal Protection Clause claim, arguing that "Defendants engaged in selective enforcement against pro-life PRCs while ignoring complaints against abortion providers . . . because of their religious and political speech."  Doc. No. 80 at 27–28. To establish such a claim, the plaintiff must allege that "(1) the [plaintiff], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  Rubinovitz v. Rogato, 60 F.3d 906, 909–10 (1st Cir. 1995).

YOM has not plausibly alleged this claim.  First, YOM has not identified a proper comparator.  The basis of its selective enforcement claim is that "[s]imilarly situated entities that

**Add.55**

do not share the same viewpoint as YOM, that is, abortion providers, do not receive the same scrutiny from Defendants." Doc. No. 64 ¶ 333. However, clinics that provide abortion are not similarly situated to YOM "in all relevant aspects." Fincher v. Town of Brookline, 26 F.4th 479, 487 (1st Cir. 2022). "The 'relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result." Tapalian v. Tusino, 377 F.3d 1, 6 (1st Cir. 2004). PRCs, which do not provide abortions or refer patients to abortion providers, offer a limited set of medical services to pregnant patients. YOM has not alleged that abortion providers, too, refuse to provide certain pregnancy-related medical services. Furthermore, the majority of PRCs are unlicensed, precluding DPH from directly overseeing their operations and ensuring their compliance with state medical laws. The amended complaint does not allege that most abortion providers in Massachusetts are also unlicensed. These differences are material to this case, where the state launched a campaign for the precise purpose of educating the public about PRCs' limited scope of medical services and potential deviation from state medical laws and licensure requirements. In this context, abortion providers do not plausibly demand a like result. YOM has not identified any other comparators or comparable circumstances. To the extent YOM argues that it was disparately treated from similarly situated entities because of its religious beliefs, the more appropriate comparator would be non-religious PRCs. YOM notes that most, not all, PRCs are religiously affiliated. Doc. No. 80 at 10–11. However, nothing in the amended complaint indicates that the government treated non-religious PRCs more favorably than religious ones.

Even assuming for the sake of this discussion that abortion clinics are appropriate comparators, YOM has not sufficiently alleged that impermissible considerations drove Defendants' decisions and actions. DPH subjected YOM to one investigation based on a

**Add.56**

complaint that facially suggested YOM's non-compliance with neutral medical standards.  As explained above, there is no indication that this enforcement action was taken to suppress YOM's speech or to punish its religious beliefs.  Beyond that single investigation, the complaint mentions no other enforcement actions taken by Defendants against YOM.  The factual allegations do not plausibly suggest that Defendants have attempted to stifle YOM's speech, including its speech about medication abortion reversals.  And, as detailed above, the complaint lacks allegations suggesting that Defendants created and coordinated the public education campaign based on their desire to silence YOM's protected speech or based on their hostility against its religious beliefs.  Furthermore, YOM has alleged no facts indicating that Defendants launched the campaign out of bad faith or a malicious intent to injure.  Rubinovitz, 60 F.3d at 911 (noting malice or bad faith cases are infrequent and "should be scrupulously met").  Finally, while YOM identifies complaints lodged against some clinics that provide abortions, it has not alleged that DPH failed to investigate these complaints or take action.[23]

---

[23] A plaintiff must do more than advance the conclusory allegation that someone else did not receive the same scrutiny.  The plaintiff must advance some additional, non-conclusory factual allegations.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Here, there are none.  YOM alleges that DPH received more total complaints for abortion providers (eight) than for PRCs (two) between 2022 and 2024, but it does not allege that DPH ignored the complaints against abortion providers or handled these complaints with less scrutiny.  YOM's only specific allegation is too insubstantial to cloak the claim in plausibility.  Governing regulations direct DPH to inspect clinics every two years.  Doc. No. 64 ¶ 191.  YOM alleges that DPH has done so at each PRC but has not done so for one abortion clinic since 2018.  Id.  YOM does not allege that other abortion clinics have not been subjected to these two-year inspections.  This narrow allegation about a single abortion provider, without more, fails to make plausible the assertion that DPH is targeting PRCs for enforcement action because of their religious views or protected speech.  This is especially so in light of the fact that there are no allegations that DPH overreached in investigating YOM or engaged in any improper enforcement action against YOM.  And as previously mentioned, the amended complaint does not seek any relief from pending or prospective enforcement action.

**Add.57**

Because YOM has not plausibly alleged that Defendants engaged in actions based on an impermissible purpose, rational-basis review applies.  See also Wirzburger v. Galvin, 412 F.3d 271, 282 (1st Cir. 2005) ("Where a plaintiff's First Amendment Free Exercise claim has failed, the Supreme Court has applied only rational basis scrutiny in its subsequent review of an equal protection . . . claim based on the same facts.").  As the Court has already addressed, Defendants' actions survive rational-basis review.  Therefore, the Court ALLOWS the motions to dismiss Count III.

## IV.    REMAINING ISSUES

Because the Court dismisses all three counts for failure to state a claim on the merits, the Court declines to address the other arguments advanced by Defendants, including but not limited to whether State Defendants are entitled to qualified immunity and whether Defendants REN and Holder acted under color of law.  There is one caveat to the foregoing.

At the motion hearing, counsel for YOM conceded that (1) without plausibly alleging that REN and Holder acted under color of law, YOM has not stated a claim against these Defendants; and that (2) these two Defendants, at most, acted under color of law only with respect to the state's media campaign, but not with respect to the exercise of any state regulatory authority.  Given these concessions, REN and Holder's motion to dismiss is also ALLOWED because without state coercive authority, these particular Defendants did not (and could not) make any sort of threat to wield state authority against YOM.

58

**Add.58**

V.    CONCLUSION

Accordingly, the motions to dismiss YOM's amended complaint, Doc. Nos. 70, 72, are

ALLOWED.  A separate judgment of dismissal with enter.  Each side shall bear its own costs

and fees.

SO ORDERED.


 /s/ Leo T. Sorokin
United States District Judge

**Add.59**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

<u>**A Woman's Concern, Inc.**</u>

*Doing business as*
Your Options Medical

     Plaintiff,

           CIVIL ACTION NO. <u>24-12131-LTS</u>

   V.

<u>**Maura T. Healey et al**</u>

     Defendants.

## <u>ORDER OF DISMISSAL</u>

<u>Sorokin, D. J.</u>

   In accordance with the Court's ORDER ON MOTIONS TO DISMISS, Dkt, No. 90, dated <u>February 17, 2026,</u> it is hereby ORDERED that the above-entitled action be and hereby is DISMISSED.

          By the Court,

<u>2/17/2026</u>        <u>/s/ Flaviana de Oliveira</u>
 Date          Deputy Clerk

**Add.60**